JUSTICE MORRIS
delivered the Opinion of the Court.
¶1 Peter Bamaby (Bamaby) appeals from his conviction in the Twentieth Judicial District, Lake County, for operation of a clandestine laboratory. We affirm in part, reverse in part, and remand for further proceedings.
¶2 We review the following issues on appeal:
¶3 Whether the District Court properly denied Barnaby’s motion to suppress evidence discovered during the search of his residence.
¶4 Whether the District Court properly denied Barnaby’s Batson challenge.
¶5 Whether the District Court properly considered alternatives to imprisonment when sentencing Barnaby, a first time nonviolent felony offender.
*222 FACTUAL AND PROCEDURAL BACKGROUND
¶6 Narcotics officers suspected the operation of a methamphetamine laboratory at Barnaby’s residence involving June Sheridan (Sheridan). Officer Louis Fiddler (Officer Fiddler), a Flathead Tribal Police Narcotics Investigator, applied for a warrant to search Barnaby’s residence on February 11, 2002.
¶7 The application for a warrant begins with information pertaining to Sheridan’s knowledge of how to manufacture methamphetamines. A confidential informant reported in February of 2000 that he and Corey Minez (Minez) had been taught to make methamphetamines by Ferren Galpin (Galpin). The police arrested Minez for the production of methamphetamines on March 10,2000. Minez confessed that he had been taught how to manufacture methamphetamines by Galpin and informed the police that Galpin also had taught Sheridan how to produce methamphetamines.
¶8 A concerned citizen contacted investigators “in reference” to Sheridan manufacturing methamphetamines in July of 2000. The warrant application uses the terms “concerned citizen” and “citizen informant” interchangeably. We, too, use the terms interchangeably for the purposes of this opinion. The citizen reported from first-hand knowledge and personal observations that Galpin had taught Sheridan how to produce methamphetamines. The application stated that Galpin is now serving a lengthy sentence after being convicted for the production of methamphetamines.
¶9 The application contains several reports that detail Sheridan’s efforts to obtain the ingredients used in the production of methamphetamines. Employees at a Target store in Missoula detained Sheridan for the attempted shoplifting of five boxes of suphedrine tablets on May 18, 2001. Sheridan confessed to a police officer and Target employee that she had attempted to steal the tablets. Sheridan admitted that she had stolen several boxes of suphedrine tablets from Target in the past.
¶10 Officer Fiddler spoke with a citizen informant on July 18, 2001, who had been involved with Sheridan. The citizen reported to Officer Fiddler that Sheridan had lived on his property for some period of time. The citizen had found a box labeled “June’s Stuff’ on his property that contained acetone, red devil lye, toluene, coffee filters, and several “hot plates.” Officer Fiddler stated in the application that he knew from his training and experience that those items are used in the production of methamphetamines. The citizen also reported that his closet had been stained brown during the time that Sheridan had lived *223 on his property. Officer Fiddler stated in the application that materials are commonly stained brown during the production of methamphetamines. The citizen informed Officer Fiddler that he found empty suphedrine boxes in Sheridan’s vehicle and that he believed that Sheridan concealed the items used to produce methamphetamines in the trunk of her car because Sheridan would never allow him to be close to it.
¶11 A drug force agent observed Sheridan purchasing two cans of toluol from a hardware store in Ronan on October 17, 2001. The application stated that toluol constitutes a known ingredient in the production of methamphetamines.
¶12 A tribal police officer advised Officer Fiddler on November 5, 2001, of information concerning the home of Sheridan’s parents. The officer stated that Sheridan had been responsible for watching her parent’s house for two weeks while they were out of town. Sheridan’s parents became ill with sinus problems shortly after they returned home. Officer Fiddler stated in the application that based on his experience he knows that it is common for people to have sinus problems when they are exposed to a location where the production of methamphetamines has taken place.
¶13 The application contains the reports of two concerned citizens who reported that Sheridan operated a methamphetamine laboratory at Barnaby’s residence. A concerned citizen contacted Officer Fiddler on November 7, 2001, to report that Sheridan lived with a “Peter or Joe” Bamaby at Bamaby’s house near Coldwater Lane. The concerned citizen believed that Sheridan operated a methamphetamine lab at Bamaby’s residence. The application did not state the source of the citizen’s information. Another citizen informant contacted Officer Fiddler on November 28, 2001, to report that Sheridan operated a methamphetamine lab at Barnaby’s house. The application again failed to state the source of the citizen’s information.
¶14 An agent with the drag task force contacted a local pharmacist in January of 2002 to determine whether the pharmacist knew of any people who had been purchasing large amounts of pseudoephedrine or ephedrine products. The application stated that pseudoephedrine and ephedrine are known to be essential ingredients in the production of methamphetamines. The employee reported that Sheridan visited the store at least once a week to purchase ephedrine products. The pharmacist also reported that she suspected Sheridan of the illicit use of ephedrine products due to certain indicators. The pharmacist reported that Sheridan appeared “jittery,” had bags under her eyes, *224 and always paid in cash. The pharmacist knew these indicators of methamphetamine use as the result of speaking with a drug task force agent on a previous case.
¶15 The application stated that Officer Fiddler made contact with a concerned citizen on January 17,2002, who personally viewed a series of odd events at Barnaby’s residence after Sheridan’s arrival. The citizen reported that he knew of Sheridan’s arrival at Barnaby’s house by the presence of Sheridan’s car, a gray 1987 Cougar. The citizen reported that he knew Sheridan from living in the Arlee area and also knew that the vehicle belonged to her. The citizen reported that Sheridan’s vehicle had spent a lot of time at the Barnaby residence over the previous two months.
¶16 The concerned citizen reported that unusual activities had been occurring at the Barnaby residence since the arrival of Sheridan’s vehicle. The citizen reported heavy traffic to and from the Barnaby residence at all hours of the day and night, with visitors staying only for a short amount of time. The concerned citizen observed someone back Sheridan’s vehicle up to the door of Bamaby’s house and then unload various items from the trunk. The citizen further stated that Barnaby had built a makeshift barrier out of tarps and plastic to prevent neighbors from seeing Barnaby and Sheridan unloading items from Sheridan’s car. The barrier also prevented the citizen from viewing some movement around the property. The citizen reported that before Sheridan’s arrival, Barnaby burned a fire outside his home only once or twice a year for the purposes of heating a sweat lodge, but now a fire burned almost constantly. The fire always burned during periods of strange activity at the house.
¶17 The warrant application stated that all of the persons mentioned in the application had given reliable information in the past. They had all been proven reliable with corroborating information that resulted in arrests from the information they provided. The application further stated that all of the above informants operated separate and apart from each other, and were not aware of the other’s participation. The application for a warrant did not distinguish between confidential informants, citizen informants, and concerned citizens.
¶18 Judge McNeil apparently signed the warrant on February 11, 2002, although the warrant was dated February 11,2001. The warrant authorized officers to search a residence identified as 21 Coldwater Drive. Officers conducted a search of Bamaby’s residence pursuant to the warrant two days later. The search revealed various items used in the production of methamphetamines and other drug paraphernalia. *225 The State charged Barnaby and Sheridan with operating a clandestine laboratory in violation of § 45-9-132, MCA, on September 19, 2002. ¶19 Barnaby and Sheridan moved separately to suppress the evidence discovered during the search before trial based upon a lack of probable cause to search Bamaby’s residence. Both argued that the search was invalid due to the fact that Judge McNeil signed the warrant in 2001 and the officers conducted the search in 2002. The District Court agreed with the State that Judge McNeil likely had made a typographical error and actually had signed the warrant on February 11, 2002. Both also challenged the warrant’s validity on the grounds that it authorized the officers to search a residence located at 21 Coldwater Drive, while Barnaby’s house is located at 1-12 Coldwater Lane.
¶20 Officer Fiddler testified at the suppression hearing as to how he had determined Bamaby’s address using a police database compiled through emergency responses. Officer Fiddler further testified that he had grown up in the area and he had known the location of Barnaby’s house since he was a child. Officer Fiddler also attached a map of the area and a photograph of the house to the warrant application that described how to reach the house. Finally, Officer Fiddler testified that the low density of housing in the area, “maybe five, six” per square mile, made misidentification of the house unlikely. This evidence satisfied the District Court that the warrant correctly described the house to search.
¶21 Barnaby’s motion also argued that much of the information contained in the application for a warrant pertained solely to Sheridan, and that such information did not provide probable cause to search his residence. Barnaby further contended that the information that did concern his residence did not amount to sufficient evidence to establish probable cause. Sheridan’s motion also challenged the factual predicates used to establish probable cause to support the issuance of the warrant. She alleged that the police had failed to corroborate adequately information received from informants. The State’s response brief asserted that Officer Fiddler had stated in the warrant application that each person listed in the warrant application had provided reliable information in the past. Neither Barnaby nor Sheridan filed a reply brief to challenge this assertion.
¶22 At Bamaby’s request, the District Court combined his suppression hearing with Sheridan’s after he attested that “at least exactly the same witnesses, if not exactly the same evidence” would be presented. Counsel for Sheridan and Barnaby relied on the arguments made in *226 Sheridan’s brief in support of her motion to suppress regarding the State’s lack of corroboration. Barnaby explicitly joined in the arguments made in Sheridan’s brief. Their questioning of Officer Fiddler at the suppression hearing centered on the address listed in the warrant application. The District Court denied Barnaby’s motion to suppress.
¶23 The case then proceeded to jury selection. The State exercised two peremptory challenges to remove tribal members, Mary Lefthand (Lefthand) and Ronda Michell (Michell). Lefthand had stated during voir dire that Bamaby’s father was her adopted brother. Michell stated that she considered Barnaby’s counsel, Joey Jayne (Jayne), a good friend. Barnaby also used a peremptory challenge to remove a tribal member from the jury, Steven DuPuis (DuPuis).
¶24 Barnaby then objected to the State’s use of peremptory challenges in chambers. Defense counsel argued that the State improperly removed Lefthand and Michell from the venire based solely upon their race in violation of the rule set forth in Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. The State responded by explaining that it had stmck Lefthand because of her relationship to the defendant, and Michell because she was a close friend of Barnaby’s attorney. The District Court also noted that Barnaby’s counsel had stmck DuPuis from the venire. The District Court overruled Bamaby’s Batson objection.
¶25 The jury convicted Barnaby of operating a clandestine laboratory. Barnaby filed a motion for a new trial contending that the District Court had improperly denied his Batson objection. The District Court denied Bamaby’s motion in a written order. The court explained that the record clearly indicated that of the two tribal members challenged by the State, one considered herself a good friend of Barnaby’s attorney, and the other was related to Barnaby. The District Court further explained its rationale for denying the motion by noting that the State did not challenge another tribal member, DuPuis.
¶26 The District Court held a sentencing hearing on October 21,2004. Defense argued for alternatives to imprisonment in light of the fact that Barnaby was a nonviolent first time offender according to § 46-18-225, MCA. Defense counsel recommended that Barnaby receive a term at the Department of Corrections. The State recommended a sentence of ten years at the Montana State Prison, with five suspended. The District Court sentenced Barnaby to eight years at the Montana State Prison, with three suspended.
*227 ¶27 Barnaby objected to the sentence on the basis that the District Court did not adequately consider alternatives as required by § 46-18-225, MCA. The District Court responded that it had adequately considered the alternatives to imprisonment. The written sentencing order issued by the District Court stated the court had taken into account the nature of the offense in this matter for which the court has significant concerns and Barnaby’s lack of any prior felony record. The District Court also stated that it imposed a prison sentence to provide punishment to Barnaby with an opportunity for his rehabilitation. The order did not mention any of the criteria contained in § 46-18-225, MCA. This appeal followed.
DISCUSSION
¶28 Barnaby contends that the District Court improperly denied his motion to suppress evidence as the search of his residence was not supported by probable cause. He also argues that the District Court improperly denied his Batson objection. Finally, Barnaby maintains that the District Court failed to consider adequately alternatives to imprisonment when imposing his sentence.
Motion to Suppress
¶29 We have adopted the “totality of the circumstances” test set forth in Illinois v. Gates (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, to evaluate whether probable cause supported the issuance of a warrant. State v. Reesman, 2000 MT 243, ¶ 24, 301 Mont. 408, ¶ 24, 10 P.3d 83, ¶ 24. Under the totality of the circumstances test, the issuing judicial officer must make a practical, common sense determination, given all the evidence contained in the application for a search warrant, whether a fair probability exists that contraband or evidence of a crime will be found in a particular place. Gates, 462 U.S. at 238, 103 S.Ct. at 2332.
¶30 An application for a search warrant must state facts sufficient to show probable cause for the issuance of a warrant. A determination of probable cause does not require facts sufficient to make a showing of criminal activity, rather, the issuing judicial officer must only determine that there exists a probability of criminal activity. State v. Rinehart (1993), 262 Mont. 204, 210, 864 P.2d 1219, 1222. Probable cause must be determined solely from the information contained within the four corners of the search warrant application. Rinehart, 262 Mont. at 211, 864 P.2d at 1223. Our function as a reviewing court is to ensure ultimately that the issuing judicial officer had a *228 “substantial basis” to determine that probable cause existed. Reesman, ¶ 19.
¶31 The application for a search warrant begins with credible information of Sheridan’s involvement in the production of methamphetamines. A concerned citizen reported from first-hand knowledge and personal observations that Galpin, a well-known methamphetamine manufacturer, taught Sheridan how to produce methamphetamines. The first-hand report of a concerned citizen generally represents reliable information. State v. Oleson, 1998 MT 130, ¶ 14, 289 Mont. 139, ¶ 14, 959 P.2d 503, ¶ 14 (overruled in part on other grounds by State v. Kuneff, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19). Minez also reported that Galpin taught Sheridan how to manufacture methamphetamines.
¶32 The application then charts a continuing course of action by Sheridan to gather and possess the materials used to manufacture methamphetamines through the first-hand reports of several reliable sources. Sheridan had been arrested shoplifting several boxes of suphedrine tablets from a Target store and admitted to a police officer and Target employee that she had successfully shoplifted several boxes of tablets on previous occasions. A citizen informant reported finding a box labeled “June’s Stuff’ that contained several items used in the production of methamphetamines. A narcotics officer witnessed Sheridan purchasing two cans of toluol from a hardware store. A local pharmacist observed that Sheridan purchased ephedrine tablets at least once a week and reported that Sheridan had the physical appearance of a person using methamphetamines.
¶33 Bamaby contends that evidence of Sheridan’s involvement in the production of methamphetamines does not establish probable cause to search his residence. We agree that it does not follow in all cases, “simply from the existence of probable cause to believe a suspect guilty, there is also probable cause to search his residence.” State v. Kaluza (1993), 262 Mont. 360, 362, 865 P.2d 263, 264 (citing United States v. Valenzuela (9th Cir. 1979), 596 F.2d 824, 828). “But it is also clear that interpreting a search warrant in the proper ‘commonsense and realistic fashion’ may result in the inference of probable cause to believe that criminal objects are located in a particular place.” Valenzuela, 596 F.2d at 828 (citation omitted).
¶34 The evidence of Sheridan’s involvement with methamphetamines must be considered along with the other information contained in the application. See State v. St. Marks, 2002 MT 285, ¶ 23, 312 Mont. 468, ¶ 23, 59 P.3d 1113, ¶ 23; State v. Gray, 2001 MT 250, ¶ 11, 307 Mont. *229 124, ¶ 11, 38 P.3d 775, ¶ 11. A concerned citizen contacted Officer Fiddler on January 17, 2002, to report that he personally viewed Sheridan’s car spending a lot of time at the Bamaby residence over the previous two months. The citizen stated that he knew Sheridan from the Arlee area and knew the car that she drove. That report constitutes rehable information of Sheridan’s frequent presence at Barnaby’s residence. Oleson, ¶ 14. The report of a separate concerned citizen who contacted Officer Fiddler on November 7, 2001, also contained information that Sheridan resided at least part-time at Bamaby’s.
¶35 The information pertaining to Sheridan possesses probative value when determining whether a fair probability exists that the items used in the manufacturing of methamphetamines may be found at Barnaby’s residence. “The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific ‘things’ to be searched for and seized are located on the property to which entry is sought.” Zurcher v. Stanford Daily (1978), 436 U.S. 547, 556, 98 S.Ct. 1970, 1976-77, 56 L.Ed.2d. 525. We deemed it appropriate in Gray, ¶ 21, to impute to Gray suspicious activity engaged in by his companion, Wallace, in assessing probable cause. Similarly in St. Marks, ¶ 38, we determined that corroboration of criminal conduct by St. Mark’s companion, Torres, could be imputed to St. Marks. The same holds trae for corroboration of Sheridan’s conduct in this case.
¶36 We emphasize that Sheridan’s mere presence at the house does not amount to sufficient probable cause to search Barnaby’s residence. See Kaluza, 262 Mont. at 362, 865 P.2d at 264. The information relating to Sheridan’s involvement with methamphetamines and presence at Bamaby’s is not so compelling that it establishes probable cause of Barnaby’s own involvement in manufacturing methamphetamines. The information may support a conclusion that the instruments used to manufacture methamphetamines may be found at Bamaby’s residence, however, when considered in combination with other information under the totality of the circumstances test. See State v. Holstine (1993), 260 Mont. 310, 315, 860 P.2d 110, 113.
¶37 The information pertaining to Sheridan must be evaluated in conjunction with the information specifically related to suspicious and illegal activities at Barnaby’s residence. A concerned citizen contacted Officer Fiddler on November 7,2001, to report that they believed that Sheridan operated a methamphetamine laboratory at Bamaby’s *230 residence. A separate citizen informant contacted Officer Fiddler on November 28, 2001, to report that Sheridan operated a methamphetamine laboratory at Barnaby’s residence. The January 17, 2002, report of the concerned citizen who reported Sheridan’s presence at Barnaby’s house also reported personally viewing a series of suspicious activities since Sheridan’s arrival. The citizen reported that he observed, among other things, heavy traffic to and from the Barnaby residence at all hours of the day and night with visitors staying only for a short amount of time; that someone backed Sheridan’s car all the way to the door of the house to unload items from the trunk; and a barrier had been built on the residence to hide movement on the property and block anyone from further viewing items being unloaded from the trunk.
¶38 Barnaby uses a “divide and conquer” approach for evaluating the sufficiency of the application for a warrant. After dismissing the information concerning Sheridan as an insufficient basis for probable cause, Barnaby engages in a mechanical application of Reesman to evaluate separately the reports of the three concerned citizens. Barnaby argues that the reports of the concerned citizens who contacted Officer Fiddler on November 7, 2002, and November 28, 2002, provide no support in a probable cause analysis as the warrant application fails to state whether the citizens based the information on their own personal observations. See Reesman, ¶ 29. Barnaby maintains that the report of the concerned citizen on January 17,2002, required independent corroboration because the warrant application failed to describe the circumstances under which the information became known, despite the application explicitly stating that the concerned citizen personally observed the events described in the warrant. Oleson, ¶ 14. Moreover, he claims that this last report does not allege any illegal activity, but merely alleges “odd events” and “strange activity.” We disagree.
¶39 The critical question when evaluating probable cause is not whether an individual report meets the requirements of a particular test, but whether the application as a whole states sufficient facts to support a determination of probable cause. See Gates, 462 U.S. at 230-231, 103 S.Ct. at 2328. Factors that possess little probative value on their own, when considered under the totality of the circumstances test, can provide support for a determination of substantial evidence to conclude probable cause existed when considered in combination with other information. Holstine, 260 Mont. at 315, 860 P.2d at 113. We must determine whether all the information in the *231 application-Sheridan’s involvement in the production of methamphetamines, her continued presence at Bamaby’s house, the two reports that Sheridan operated a methamphetamine laboratory at Bamaby’s house, and the report of suspicious activity at Bamaby’s house since Sheridan’s arrival — amounts to a substantial basis for determining whether probable cause supported the issuance of a warrant. Gates, 462 U.S. at 238-239, 103 S.Ct. at 2332.
¶40 Barnaby’s method of evaluating a warrant urges this Court to take a step away from the totality of the circumstances test in favor of the application of a three-prong test reminiscent of the long discarded two-prong test of Aguilar-Spinelli. See Aguilar v. Texas (1964), 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723; Spinelli v. United States (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. In Gates, the Court rejected the two-prong test of “reliability” and “basis of knowledge” holding that the elements should not “be understood as entirely separate and independent requirements to be rigidly exacted in every case.” Gates, 462 U.S. at 230, 103 S.Ct. at 2328. Bamaby’s approach rigidly evaluates the “reliability” and “basis of knowledge” of an individual informant and then mandates whether independent corroboration is required, without regard to any other information that might be contained in the application. This method conflicts with the totality of the circumstances approach by forcing a judicial officer to apply a strict test to evaluate each element in a warrant separately rather than allowing the judicial officer to consider the information as a whole when determine probable cause.
¶41 The first Dissent argues that our holding undermines Reesman. Dissent, ¶¶ 61-71. We concede that this case deviates slightly from our decision in Reesman as we cannot easily reconcile Reesman’s strict rules requiring independent police corroboration with the flexibility of the totality of the circumstances test. Probable cause poses a fluid concept turning on the assessment of probabilities in a particular factual context, “not readily, or even usefully, reduced to a neat set of legal rules.” Gates, 462 U.S. at 232, 103 S.Ct. at 2329. Reesman still provides useful guidelines to evaluate a warrant application, however, the guidelines become impractical in cases such as this, where the police receive rehable reports from several concerned citizens yet no single report satisfies all the Reesman criteria.
¶42 We do not disturb the principle that independent police corroboration represents a key element in determining whether probable cause exists to issue a warrant. We also admonish police officers to corroborate independently information from sources of *232 questionable reliability. See Gates, 462 U.S. at 241-42, 103 S.Ct. at 2334. We simply determine that the proposition set forth in Reesman that independent police work represents the only method of corroboration under the totality of the circumstances test is wrong as a matter of law. Two justices specially concurred and one dissented from the majority’s opinion in Reesman because of this very issue. Reesman, ¶ 49, ¶ 80.
¶43 Justice Regnier joined the Court in determining that no probable cause existed to support the decision of the judicial officer to issue a warrant. Reesman, ¶ 49. Justice Regnier in his concurring opinion rejected as “too restrictive,” however, the Court’s notion that corroboration must be accomplished through police investigation. Reesman, ¶ 49 (Regnier, J., concurring). He emphasized that “corroboration could be accomplished by other means” than police investigation. Reesman, ¶ 58 (Regnier, J., concurring). Justice Regnier recognized that the Court’s myopic focus on “police investigation” diverts the judicial officer’s attention from the more important question of whether the warrant application establishes probable cause for the search. Reesman, ¶ 58 (Regnier, J., concurring).
¶44 The second Dissent, ¶¶ 72-191, mischaracterizes our holding as overruling or calling into doubt an array of precedents that relate to this decision only in that each affirms a finding of probable cause to issue a search warrant. For example, State v. Meyer, 2004 MT 272, ¶¶ 25, 31, 323 Mont. 173, ¶¶ 25, 31, 99 P.3d 185, ¶¶ 25, 31, is the first in a string of cases cited by the Dissent as being overruled or called into doubt. We strike not even a glancing blow upon the continued vitality of Meyer. The Dissent cites two paragraphs in Meyer that discuss issues that we do not even tangentially address: the timeliness of a warrant application and the proposition that we deem as reliable an informant that makes a statement against their interest. Meyer, ¶¶ 25, 31.
¶45 Our decision similarly strikes no blow on the continued vitality of other cases that cite Reesman. See, e.g., State v. Bowman, 2004 MT 119, ¶ 30, 321 Mont. 176, ¶ 30, 89 P.3d 986, ¶ 30 (using Reesman guidelines to determine that game warden corroborated anonymous tip by learning from taxidermist that bullet had pierced cape from bull elk); State v. Olson, 2003 MT 61, ¶¶ 25-27, 314 Mont. 402, ¶¶ 25-27, 66 P.3d 297, ¶¶ 25-27 (usingReesman guidelines to determine that report of non-anonymous, concerned citizen who witnessed meth lab provided sufficient probable cause to support warrant); State v. Grams, 2002 MT 188, ¶¶ 17-19, 311 Mont. 102, ¶¶ 17-19, 53 P.3d 897, ¶¶ 17-19 (using *233 Reesman to conclude that five informants’ reports based on personal observations against their interest provided adequate basis for warrant). We fully agree that the reliable reports in those cases constituted sufficient probable cause to support a search warrant. We simply overrule an unduly restrictive rule that never should have been imposed under the long-established and flexible totality of the circumstances test. Gates, 426 U.S. at 230-231, 103 S.Ct at 2328 (defining probable cause as a practical nontechnical concept more appropriately defined by the totality of circumstances approach than any rigid demand that specific tests be satisfied for every informant’s tip).
¶46 We conclude that the District Court properly denied Bamaby’s motion to suppress. The issuing judicial officer had a substantial basis for determining that probable cause existed to search Bamaby’s residence considering together all the information provided in the warrant under the totality of the circumstances test. The warrant contained highly credible evidence of Sheridan’s involvement in the production of methamphetamines and her presence at Bamaby’s residence. Two separate concerned citizens contacted Officer Fiddler to report that Sheridan operated a methamphetamine laboratory at Bamaby’s residence. Another concerned citizen personally viewed a series of suspicious activities at Bamaby’s residence following Sheridan’s arrival. The fact that the application for a warrant did not include a specific account of the circumstances under which some informants viewed the events, or whether the two citizens based their reports on personal observations, does not preclude a court from finding probable cause. The information relating to Sheridan and the reports of concerned citizens provide a basis for finding probable cause in this case, although none of the reports, on its own, satisfy the Reesman criteria.
Batson Challenge
¶47 Barnaby next contends that the District Court improperly denied his Batson challenge. We will defer to the trial court’s findings of fact unless clearly erroneous, when considering a trial court’s ruling on a challenge that a litigant has exercised its use of peremptory challenges in a discriminating manner, and will review the trial court’s application of law de novo. State v. Ford, 2001 MT 230, ¶ 7, 306 Mont. 517, ¶ 7, 39 P.3d 108, ¶ 7.
¶48 Batson set out a three-prong test to determine whether the State exercised its peremptory challenges in a discriminatory manner. First, the defendant must make out a prima facie case of purposeful *234 discrimination. Ford, ¶ 16. To make a prima facie case, the defendant must show that he or she belongs to a cognizable racial group. Batson, 476 U.S. at 96, 106 S.Ct. at 1723. The defendant may then rely on the fact that peremptory challenges constitute a jury selection practice that allows those to discriminate who are of a mind to discriminate. Batson, 476 U.S. at 96, 106 S.Ct. at 1723. The defendant must then show that these facts, and any other relevant circumstances, raise an inference that the State used that practice to exclude members of the venire from the petit jury on account of their race. Batson, 476 U.S. at 96, 106 S.Ct. at 1723.
¶49 Once the defendant makes a prima facie case for discrimination, we proceed to the second step, where the State must provide a race-neutral explanation for its use of peremptory strikes. Ford, ¶ 16. Finally, the trial court then will determine if the defendant has established purposeful discrimination. Ford, ¶ 16.
¶50 Barnaby objected immediately after the State removed Lefthand and Michell from the venire. The District Court did not rule whether Barnaby had presented a prima facie case for discrimination. Nevertheless, the State provided its explanations for striking the jurors. The District Court did not rule on the sufficiency of the State’s justifications, but noted for the record that the State did not strike DuPuis, a tribal member, from the venire and overruled Barnaby’s objection.
¶51 Barnaby contends that the District Court improperly applied the third step of the Batson test. Barnaby characterized the District Court’s denial of his challenge as based upon the court’s finding that the State did not strike DuPuis from the venire. Barnaby correctly points out that a court may not deny relief simply because the State did not strike all members of a particular race from the jury under Batson. See United States v. Harris (6th Cir. 1999), 192 F.3d 580.
¶52 Whether a party presented a case of purposeful discrimination represents a factual question, thus we will defer to the trial court’s findings of fact unless clearly erroneous. See Ford, ¶ 18 (holding that an appellate court will defer to the trial court’s findings unless clearly erroneous). Therefore, the trial court must develop fully a record for review - a record that includes all relevant facts and information relied upon by the trial court to render its decision, as well as a full explanation of the court’s rationale. Ford, ¶ 18.
¶53 Our review of the record demonstrates that the District Court properly overruled Barnaby’s objection based, in large part, on the race neutral explanations provided by the prosecutor. The State provided *235 race neutral explanations for both Lefthand and Michell according to the second step of Batson. See Ford, ¶ 16. It explained that it used a peremptory challenge on Michell because she considered Barnaby’s trial attorney a good friend. The State removed Lefthand because Barnaby’s father is her adopted brother. The District Court admitted into evidence notes taken by the State during voir dire to support its race-neutral explanations. The District Court then noted that Bamaby’s counsel removed DuPuis. Thus, the fact that the State did not strike DuPuis represents only one of several relevant facts that the District Court considered in overruling Barnaby’s objection.
¶54 Although the District Court developed a record at the time of Barnaby’s objection that included all relevant facts, the court failed to provide a full explanation of its rationale for overruling the Batson objection as required by State v. Parrish, 2005 MT 112, ¶ 19, 327 Mont. 88, ¶ 19, 111 P.3d 671, ¶ 19. The District Court simply overruled Bamaby’s objection after hearing the State’s explanations and noting that the State did not strike DuPuis. This full explanation proves necessary to our review of the merits of any Batson-type challenge. Parrish, ¶ 19.
¶55 We admonish the District Court to provide more detailed reasoning for the basis of denying a Batson challenge, even in cases where the defendant simply objects to the State’s use of peremptory challenges instead of specifically invoking the Batson language. We uphold the District Court’s decision, however, because the court overruled Bamaby’s Batson objection before our ruling in Parrish. Furthermore, the record demonstrates that the State provided highly credible race-neutral explanations. We remind district courts to follow the procedural mandate of Ford and Parrish to build a record and provide a full explanation for the denial of a Batson challenge in future cases to permit this Court to review adequately the denial of such a challenge on appeal.
Sentence
¶56 Bamaby finally contends that the District Court failed to consider adequately alternatives to imprisonment under § 46-18-225, MCA. We review a district court’s imposition of a criminal sentence for legality. We review the trial court’s interpretation on sentencing questions regarding statutory interpretation to determine whether it is correct. State v. McDanold, 2004 MT 167, ¶ 12, 322 Mont. 31, ¶ 12, 97 P.3d 1076, ¶ 12.
¶57 Barnaby is a nonviolent first time felony offender. A “nonviolent felony offender” is a person who has committed a felony other than a *236 “crime of violence” as defined by § 46-18-104(2), MCA. The operation of a clandestine laboratory in violation of § 45-9-132, MCA, does not fall within any of the definitions of a “crime of violence.” See § 46-18-104(2), MCA. We recognize that operation of a clandestine laboratory constitutes a “violent offense” under the Sexual or Violent Offender Registration Act. Section 46-23-502(9)(a), MCA. That act’s inclusion of operation of a clandestine laboratory as one of the specifically enumerated “violent offenses” does not affect the classification of Bamaby as a “nonviolent felony offender.” The terms “crime of violence” and “violent offense” relate to separate statutes that serve different purposes and as a consequence, do not encompass the identical set of crimes.
¶58 Section 46-18-225(1), MCA, requires a district court first to consider alternatives to imprisonment when sentencing a “nonviolent felony offender.” A district court must examine the sentencing criteria in § 46-18-225(2), MCA, in considering alternatives to imprisonment. See State v. Pence (1995), 273 Mont. 223, 231, 902 P.2d 41, 46. The statute further requires that if a district court sentences such an offender to prison, the judge shall state the reasons why it did not select an alternative to imprisonment, based on the criteria of § 46-18-225(2), MCA. Section 46-18-225(3), MCA; Pence, 273 Mont. at 231, 902 P.2d at 46.
¶59 The District Court stated that it imposed a prison sentence because of the nature of the offense, Barnaby’s lack of any prior felony record, and to provide punishment with an opportunity for rehabilitation. The District Court failed to mention, however, any of the criteria set forth in § 46-18-225(2), MCA, and fails to discuss why, when considering those factors, it deemed inappropriate an alternative to imprisonment. Thus, we vacate that portion of Barnaby’s sentence and remand for further consideration of his sentence in light of the criteria set forth in § 46-18-225, MCA.
¶60 Affirmed in part and remanded in part for further proceedings.
CHIEF JUSTICE GRAY, JUSTICES WARNER, LEAPHART and RICE concur.