JUSTICE WHEAT
dissents.
¶29 I respectfully dissent. Twenty years ago,Pastos provoked separate dissents from Chief Justice Gray, Justice Trieweiler, and Justice Hunt. All three dissents exposed different flaws in the reasoning of Pastos: that it accepted alarmism and anxiety for a compelling state interest, Pastos, 269 Mont. at 58, 887 P.2d at 209 (Trieweiler, J., dissenting) (“The majority opinion ... is that a compelling state interest can he established based on the majority’s interpretation of what they see on the evening news.”); that the Court misinterpreted the plain meaning and precedent of Montana’s right to privacy, Pastos 269 Mont. at 64-65, 887 P.2d at 212 (Gray, C.J., dissenting); that the Court’s flawed reasoning could easily swallow the right to privacy, Pastos, 269 Mont. at 66, 887 P.2d at 213 (Hunt, J., dissenting) (“This is another very long step down the road to making Article II, Sections 10 and 11 ... worthless.”). I see the same flaws in today’s Opinion. I would return to our holding in Sierra that a search must employ the least intrusive means to serve a compelling state interest that is evidenced by the facts and circumstances of the case.
A. The Meaning of Article n, § 10 of the Montana Constitution
¶30 Article II, Section 10 of the Montana Constitution states: “The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.”
¶31 The heart of this case is the true meaning of the phrase “without the showing of a compelling state interest.” The plain meaning of “showing” is “the act or an instance of establishing through evidence and argument; proof.” Black’s Law Dictionary 1413 (Bryan A. Gamer ed., 8th ed., West 2007). A showing, therefore, is not an assumption or a theory that is accepted as true without proof. Rather, a showing involves some reliance on both argument and evidence to establish or prove a certain thing.
¶32 Section 10 requires specific facts and circumstances to justify a search, and that requirement is well established in this Court’s precedent. We have interpreted Section 10 to require a totality of the circumstances evaluation of the specific situation in every other search context; for search warrants, State v. Barnaby, 2006 MT 203, ¶ 46, 333 *222 Mont. 220, 142 P.3d 809; for searches incident to arrest, State v. Cooney, 2006 MT 318, ¶¶ 14-17, 335 Mont. 55, 149 P.3d 554; Hardaway, ¶¶ 58-60 (“Under these facts, there were simply no exigent circumstances requiring a warrantless search, and the search conducted was not necessary to guarantee any of the safeguards underlying § 46-5-102, MCA.”); for consent to search, State v. Clark, 2008 MT 419, ¶¶ 27-28, 347 Mont. 354, 198 P.3d 809 (“The inquiry is dependent upon the facts and circumstances.... Indeed, it is possible that, under certain circumstances, even the owner of property will not have authority to consent to a search.”); and for searches based on any exigent circumstances. State v. Stone, 2004 MT 151, ¶ 18, 321 Mont. 489, 92 P.3d 1178. Inventory searches, then, are an outlier among our decisions.
¶33 This interpretation of Section 10 was established long before Pastos. Even when Pastos was decided, Chief Justice Gray noted that its rationale “fails to focus on the individual nature of the right to privacy” and “takes into account neither the nature of the item being searched nor the nature of the reason for the arrest.” Pastos, 269 Mont. at 64-65, 887 P.2d at 212-13 (Gray, C.J., dissenting). Alaska and Hawaii frame their privacy rights in nearly identical language to our own. Haw. Const, art. I, § 6;[1] Alaska Const, art. I, § 22.[2] Both states rejected inventory searches in the 1970s on the grounds that “each case of search and seizure without a warrant must turn on its own facts,” State v. Kaluna, 520 P.2d 51, 60 (Haw. 1974), and that officers “may not further search the arrestee’s possessions... in the absence of a warrant or circumstances which provide the basis for a more intensive search under another recognized exception to the warrant requirement.” Reeves v. State, 599 P.2d 727, 736 (Alaska 1979).
¶34 It is evident that Section 10 was drafted with the purpose to require case-by-case evaluation of specific facts and circumstances justifying the search at issue. The delegates had a major concern that a “compelling state interest” would be so broadly construed that it would consume the right of privacy. Delegate George Harper (Harper) sought to amend Section 10 to exclude the phrase “because that may be interpreted by whatever state agency happens to have an interest in invading my privacy at that particular time.” Montana *223 Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1682. The delegates approved that amendment, but later became concerned that the lack of “compelling state interest” would create confusion in this Court. Delegate Thomas Ask (Ask) reassured the delegates that their concerns were better addressed by including the language; “[b]y putting these words in, we’re giving direction to the court how they are going to interpret this. If there’s no compelling state interest, you can’t invade a person’s right of privacy. And this is going to have to be shown, and this is the direction to the court.” Verbatim Transcript, March 9,1972, p. 1851. During the debate over whether a ban on wiretapping should be included in Section 11, the delegates concluded that wiretapping may be required “in matters involving certain heinous federal crimes where the situation is such that in those instances we must risk the right of individual privacy because there is a greater purpose to be served.” Transcripts, p. 1687 (emphasis added). The delegates did not think that wiretapping should be allowed based on the inherent risk that anyone could commit a heinous federal crime, but rather, based on specific situations where heinous crime was involved. Section 10 means, and was intended to mean, that “showing of a compelling state interest” is a limited, case-by-case examination of the specific interest asserted.
¶35 This is where Pastos and the Court err. Privacy cannot be infringed simply because a compelling state interest may exist in some other instance. Instead, privacy may be infringed only when a compelling state interest is shown or proven under the totality of the circumstances of the instant situation. That “showing” requires reliance on both argument and evidence. The inventory search here was not based on evidence that Demontiney was violent or carried a dangerous explosive, and the police here had no reason to fear any of the fears of today’s majority. Instead, the search is based on the broad assumption that anyone, in any circumstance, could use a concealed gun or explosive against police after or during incarceration. That remote risk may be based on argument, but it lacks evidence based in the facts and circumstances in this case. Nor can I find proof of that risk in general, and the majority cites to none. News stories about violence in our country are heart-wrenching, but they are not a blanket excuse for abridging the right to privacy under Section 10’s plain meaning, or its original intent, or our precedent.
¶36 As a final matter, the Court cites to recently decided federal law for the proposition that an arrestee has a privacy interest in her belongings, but that those interests are “diminished.” Opinion, ¶ 12 *224 (citing Maryland, v. King,_U.S. at_, 133 S. Ct. at 1978). We have consistently distinguished federal Fourth Amendment jurisprudence from the stronger protections embodied in Section 10. King’s “diminished” expectation directly contradicts our holding that “an arrestee has an expectation of and constitutional right of privacy in the personal property on his or her person or in his or her possession while at the police station.” Pastos, 269 Mont. at 52, 887 P.2d at 204 (the only exception to this privacy interest is a compelling state interest). Perhaps unsurprisingly, we have previously rejected a search based on the same facts as King, holding that a defendant does have a reasonable expectation of privacy during his arrest. See Hardaway, ¶¶ 57-60 (swabbing for DNA was an impermissible search, as no circumstances justified the search and arrestee had reasonable expectation of privacy).
B. Less Intrusive Means
¶37 The majority declines to adopt the “less intrusive means” requirement for an inventory search, reciting the same objections to the least-intrusive means requirement as in Pastos. Opinion, ¶ 16. First, the majority fears that an arrestee can easily retrieve and use a weapon upon being released from incarceration. The risk is very remote that a random arrestee will be released from incarceration, receive her items, and immediately use those items in a violent attack on police.[3] But even if that risk were significant, why does that logic not apply to searches incident to arrest? There, police must observe “circumstances that would cause a reasonable person to believe that prompt action was necessary to prevent physical harm to police” before conducting a search on an arrestee. Hardaway, ¶¶ 40-41 (quoting Elison, ¶ 56). Certainly, officers are more at risk of having a gun pulled on them while conducting an arrest, where they are often alone or outnumbered by their arrestees and the arrestee has a chance of escape through violence. See Cooney, ¶ 16. But even in this situation of heightened danger, we require a search to be based on specific facts and circumstances. Yet, in a less dangerous situation back at the station, we require no articulation of any facts, circumstances, or danger. I cannot understand how we see a danger in one situation but not the other; dangerous items in an arrestee’s possession do not *225 become more dangerous after she is separated from them, processed and incarcerated.
¶38 The contradiction is further highlighted by State v. Graham, 271 Mont. 510, 898 P.2d 1206 (1995), a case factually indistinguishable from this case. There, an individual was arrested and separated from her purse, but the officer later retrieved the purse and performed a search incident to arrest because the purse had been in her grab area at the time of arrest. Graham, 271 Mont. at 512-13, 898 P.2d at 1207. We prohibited that search because Graham had been separated from her purse, and therefore, there was no interest in protecting the police officer, preventing the destruction of evidence, or otherwise. Graham, 271 Mont. at 513, 898 P.2d at 1208. But, under Pastos, the same search would have been valid if the officer had waited until he was at the station. In two factually indistinguishable cases, we see an opposite result depending on what search warrant exception is applied.
¶39 Second, the majority relies on an even more remote possibility of an even greater danger; that the arrestee has an explosive or incendiary device in her purse. The majority notes that, since the horrific events of September 11, 2001, this concern is even more pronounced today than when Pastos was decided. Again, does the remote possibility of terrorism justify a search of a purse incident to arrest? Or does the pervasive anxiety of 9-11 limit itself to the inventory rooms of police stations? In any event, we have specifically rejected that a “remote possibility of harm” justified “a general search of the wallet for weapons, explosives or hazardous material” in Hamilton, ¶ 39. The majority distinguishes Hamilton on the grounds that there was no risk of Hamilton pulling a gun out of the lost container. Opinion, ¶ 23. But surely, an angry possessor could use a gun in her lost purse just as easily as she could use a gun in her seized purse, and a terrorist could just as easily place a bomb in either. The difference between a lost and seized purse is simply a distinction without a difference. The majority also distinguishes Hamilton because the defendant was separated from her wallet and could not access it for a weapon. That is precisely the case here; Demontiney was separated from her purse upon her arrest, she never regained control over it, and neither the District Court nor the officers involved believed that the purse posed any danger, explosive or otherwise. The only possible inference of danger in this situation comes from this Court.
¶40 Next, the Court cites to Lafayette to hold that police must protect themselves from the arrestee’s false claims of stolen property, and that the arrestee’s property is also protected from theft by police. How does *226 the inventory search procedure protect either of those interests? A corrupt officer could easily leave a stolen item off the list of items in inventory, and a lying arrestee could just as easily fabricate allegations of stolen property. In any event, “[t]he government’s interest in protecting itself against fraudulent post-incarceration claims of loss or damage to property is at best a tenuous reason for infringing the privacy of an individual’s belongings .... To the extent that the basic purposes of an inventory search can be accomplished by means which are less intrusive on an internee’s privacy, then the constitutional rule of reason requires such means to be employed.” Kaluna, 520 P.2d at 61 (citations omitted).
¶41 Finally, the majority claims that inventory searches are the less intrusive means to combat any danger and preserve property, reasoning that “it is impractical and unreasonable” for police to assess threats on a case-by-case basis, Opinion, ¶ 16, and that such a threat assessment would be “quick and subjective, and quite possibly wrong.” Opinion, ¶ 27.1 would give more credit to our officers of the law. Police officers constantly make fact-based legal judgments about reasonable suspicion, probable cause, and exigency. In fact, we already demand that our officers employ this less intrusive means requirement when conducting an inventory search of a lost item. Hamilton, ¶ 42. Nor is the majority’s concern supported by the experiences of other states; the police of Hawaii and Alaska also operate under this standard and have effectively incorporated it into their policies for more than thirty years. In these states, the simple method for preventing illicit or dangerous objects from entering the prison is to (1) search the arrestee’s person for any objects, (2) separate the arrestee from any repositories in her possession, and (3) place all objects and repositories into an evidence bag and store them until the arrestee is released. See Kaluna, 520 P.2d at 61. This “bag it, tag it” method prohibits the arrestee from bringing weapons or drugs into prison, protects the police from any exposure to hazardous chemical or biological agents, protects the arrestee’s property, and shields the police from false claims. The compelling interests asserted, if they are compelling at all, are well served by the less intrusive “bag-it tag-it” method. The majority overcomplicates a procedure that has previously existed in Montana and currently exists elsewhere.
¶42 The more subjective, unreasonable, and wrong method would be the type of search permitted by the majority. The officer testified that “[w]e search everybody’s property or purse” and the containers inside, without regard to the item’s size or nature. It is the officer’s unfettered *227 discretion to root through a purse, an opaque sandwich container inside the purse, and any other container or object no matter its propensity for danger. Upon finding a phone, a device which is commonly used as a detonator for improvised explosives, the officer could search its contents on the grounds that a vengeful arrestee will detonate an explosive upon her release. Had the sandwich container actually contained a sandwich, the officer could search the sandwich on the remote possibility that it contains a bomb or gun. The majority requires no evaluation of facts and circumstances, only a vivid imagination, so it is the officer’s unlimited discretion which objects ought to be searched and the scope of that search, without any evaluation of danger whatsoever. This standard is more subjective, unreasonable, and prone to bias and misuse than the simple "bag it, tag it” method employed in Hawaii and Alaska.
C. Stare Decisis
¶43 The majority invokes stare decisis in support of Pastos. The irony is that Pastos itself was major departure from our Section 10 jurisprudence. See Sierra, 214 Mont. at 477, 692 P.2d at 1275; State v. Sawyer, 174 Mont. 512, 518, 571 P.2d 1131, 1134 (1977). “Stare decisis is the preferred course because it promotes evenhanded, predictable, and consistent development of legal principles...” Payne v. Tennessee, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991). Conversely, stare decisis is unwarranted when a given decision is applied unpredictably, unevenly, or is inconsistent with developing legal principles.
¶44 Pastos has wreaked havoc in our Section 10 jurisprudence. In Hamilton, the Court recognizes the error in reasoning, and limits Pastos to its facts while asserting that "the Constitution does not allow a general search of a benign object based on such a remote possibility of harm ...” Hamilton, ¶¶ 37-39. This Court now tries to reconcile Pastos and Hamilton by distinguishing the inherent danger of lost items from the inherent danger of seized items; a distinction without a difference. Sixyears after writing Pastos, even its author confusingly minimized and distinguished that decision’s handling of the less intrusive means requirement. See Deserly v. Department of Corrections, 2000 MT 42, ¶ 44, 298 Mont. 328, 995 P.2d 972 (“[W]e have adopted a less intrusive means rule’ in the context of inventory search cases.”). We are not the only jurists struggling with this decision, as the District Court also felt that the application of Pastos was disingenuous, unreasonable, and inequitable under the circumstances in this case. Finally, the blanket searches in Pastos are gradually creeping into other privacy protections. We have previously *228 rejected an overbroad search incident to arrest when it was not based on sufficient facts and circumstances. Hardaway, ¶¶ 58-59; Galpin, ¶ 56. Yet in more recent precedent we have allowed an overbroad search incident to arrest because the arrestee would inevitably be subjected to an inventory search. State v. Hilgendorf, 2009 MT 158, ¶¶ 25-27, 350 Mont. 42, 208 P.3d 401.
¶45 Pastos is troublesome to lower courts, it is applied inconsistently in our own precedent, and its reasoning is slowly eroding the privacy protections in our jurisprudence; these are the symptoms of a decision in distress. The interests promoted by adhering to stare decisis are the very interests that require overturning Pastos. That decision and its doctrine of fact-blind, categorical justifications in our warrant exceptions have been stretched far beyond their breaking points. Thornton v. United States, 541 U.S. 615, 625, 124 S. Ct. 2127, 2133 (2004) (Scalia, J., concurring). It is time to leave behind anxiety and alarmism in our legal reasoning, and replace it with an objective and realistic examination of facts as required by Section 10.

 “The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest.”

 “The right of the people to privacy is recognized and shall not be infringed.”

 As counsel for Appellant points out, many arrestees are more than happy to be released horn incarceration, and are more likely to feel relief rather them anger or vengeance. It is during the arrest itself that the arrestee is more likely to use violence in an attempt to escape police.