No. 00-337

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 230

STATE OF MONTANA,

Plaintiff/Respondent,

v.

EUGENE FORD,

Defendant/Appellant.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Thomas McKittrick, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kristina Guest, Appellate Defender Office, Helena, Montana

For Respondent:

Mike McGrath, Montana Attorney General, Mark W. Mattioli, Assistant Attorney General, Helena, Montana; Brant S. Light, Cascade County Attorney, Great Falls, Montana

Heard: July 24, 2001

Submitted: August 9, 2001

Decided: November 20, 2001

Filed:

_____

Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 On November 12, 1999, a unanimous jury in the Eighth Judicial District, Cascade County, found Eugene Ford (Ford) guilty of deliberate homicide, a felony. He was sentenced to the Montana State Prison for life and was declared ineligible for parole. Ford appeals from this verdict and sentence.

¶2 The issue presented for review is whether the District Court properly denied Ford's motion for the impanelment of a new jury. Ford alleges that the State violated his equal protection rights by improperly exercising its peremptory challenges so as to exclude women from Ford's jury panel. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In March 1999, Ford was charged with the offense of deliberate homicide involving the death of his roommate, Michael Paul. Ford's trial commenced on November 8, 1999, with selection of the jury. A review of the trial Transcript indicates the venire, comprised of fifty prospective jurors, appeared as instructed and were sworn as to their qualifications to serve as trial jurors in the case at bar. From the list of names of the prospective jurors, it appears the venire was evenly split between males and females. The first twenty-four prospective jurors, sixteen females and eight males, were drawn and the State's voir dire examination commenced. One male was excused for cause and replaced by another male. The State then passed the prospective jurors for cause and Ford's attorney conducted his voir dire examination. He challenged two female prospective jurors for cause, and they were excused and replaced by two males. One of these males was then excused for cause and replaced with another male. At this point, the prospective jury panel consisted of fourteen females and ten males.

¶4 Each party was allotted six peremptory challenges. The State exercised its peremptory challenges, excusing six females from the prospective jury panel. Ford then exercised his

peremptory challenges, excusing four females and two males. Three prospective alternate jurors were drawn, two males and one female. The State excused one male and Ford excused one male. The final jury, comprised of eight males, four females and one female alternate juror, was then sworn, and the remaining venirepersons were dismissed with the thanks of the Court.

¶5 After the jury was sworn and the venire dismissed, and outside the presence of the jury, Ford's attorney then moved for a new jury pool, claiming the State had exercised its peremptory challenges "in violation of [Ford's] right to a jury by his peers" by striking six women. The State, without verbal prompting from the District Court, offered explanations for striking five of the six excused prospective jurors. The District Court noted Ford's objection, but without explanation or reason, overruled his objection. The trial then proceeded.

¶6 Upon completion of the trial, a unanimous jury found Ford guilty of deliberate homicide. He was sentenced to the Montana State Prison for life and was declared ineligible for parole.

## STANDARD OF REVIEW

¶7 The issue of gender discrimination in jury selection is a case of first impression for this Court, and while the parties do not agree as to the appropriate standard of review this Court should apply to the case at bar, it is well established that when considering a *Batson* challenge, *i.e.*, a challenge that a litigant has exercised its use of peremptory strikes in a discriminating manner, an appellate court will defer to the trial court's findings of fact unless clearly erroneous, and will review the trial court's application of the law de novo. *Tolbert v. Page* (9th Cir. 1999), 182 F.3d 677, 1999 U.S. App. LEXIS 14201. See also *Brewer v. Marshall* (1st Cir. 1997), 119 F.3d 993, 1997 U.S. App. LEXIS 18147.

## DISCUSSION

¶8 In making his objection at trial to the peremptory challenges exercised by the State, Ford's counsel claimed that the State had violated his right "to a jury by his peers." It was not until he filed his appeal that Ford first labeled his dispute over the State's exercise of peremptory challenges a "Batson" challenge. (Appellant's Brief, p. 17). Because this Court has not previously addressed *Batson* and its progeny, we deem it appropriate to briefly review the history and evolution of the *Batson* challenge to jury composition.

¶9 All citizens of this country and of this state are guaranteed equal protection under the laws by the United States Constitution and the Montana Constitution. Section 1 of the Fourteenth Amendment of the United States Constitution reads:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

¶10 Article II, Section 4 of the Montana Constitution reads:

> The dignity of the human being is inviolable. No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.

These constitutional provisions are intended to eliminate governmental discrimination based upon race, gender, religion, or political philosophy.

¶11 In a landmark case in 1880, the United States Supreme Court, explaining a function of the recently ratified Fourteenth Amendment (1868), informed the State of West Virginia that its juror qualification statute, allowing only "white male persons" to be eligible for jury service, was a violation of a black defendant's right to a jury selected "without discrimination against all persons of his race or color, because of their race or color." *Strauder v. West Virginia* (1880), 100 U.S. 303. In 1881, the facts of *Neal v. Delaware*, 103 U.S. 370, prompted the U.S. Supreme Court to extend *Strauder* by holding that Delaware's refusal to call black citizens to jury duty was also unconstitutional. Since that time, the Fourteenth Amendment has repeatedly been invoked to support the eradication of discrimination in the jury selection process.

¶12 While these early Supreme Court opinions instructed states to include black citizens in venires, they failed to guarantee that black citizens would actually serve on juries. Through the use of peremptory challenges, prosecutors were for many years generally successful in eliminating black juror participation. Stephen R. DiPrima, Note: *Selecting a*

*Jury in Federal Criminal Trials After Batson and McCollum*, 95 Colum. L. Rev. 888, 900 (1995).

¶13 Courts throughout our history have lauded the importance of peremptory challenges to our judicial system. The peremptory challenge "is one of the most important of the rights secured to the accused." *Pointer v. United States* (1894), 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208, 214. It is "an essential part of the trial," and, more specifically, it is "essential to the fairness of trial by jury." *Lewis v. United States* (1892), 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011, 1014. See also, Holland v. Illinois (1990), 493 U.S. 474, 484, 110 S.Ct. 803, 809, 107 L.Ed.2d 905, 919.

¶14 Peremptory challenges are used during voir dire to strike members of the venire who the striking party prefers not to have on the jury, usually because of a perceived bias on the part of the potential juror. Unlike strikes for "cause," which are accompanied by an expressed reason for the strike, peremptory strikes may be exercised without having to explain the reason behind them. Peremptory strikes are often based primarily on instinct, and are cherished tools, guarded protectively by litigators. It in undeniable, though, that an unfortunate consequence of not having to explain the peremptory strike has been that persons have been excluded from jury participation because of their race or gender. However, as long as the use of the peremptory challenge was unfettered, any discriminatory motive would be unproven and, in any event, immaterial.

¶15 The unrestrained use of peremptory challenges came to an end with *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. In *Batson,* the U.S. Supreme Court developed the rule that the state, in a criminal case, cannot utilize its peremptory challenges to remove prospective jurors on the sole basis of race. Batson was a black man indicted in Kentucky on charges of second degree burglary and receipt of stolen goods. During jury selection, the prosecutor used his peremptory challenges to strike all four black persons on the venire, and an all-white jury convicted Batson on both counts. Defense counsel argued to the trial court at the time of jury selection that the prosecutor's use of his peremptory challenges violated Batson's rights under the Sixth and Fourteenth Amendments. In keeping with the attitude that peremptory challenges were sacred, the trial court informed defense counsel that peremptory challenges could be used to "strike anybody they want to." The Kentucky Supreme Court affirmed the trial court. *Batson*, 476 U.S. at 83-84.

¶16 The United States Supreme Court reversed the lower court's decision. The Court held that purposeful racial discrimination by the government in the jury selection process was a

violation of the Equal Protection Clause of the Constitution. *Batson*, 476 U.S. at 89. The Court set out a three-prong procedure to be used by the trial court when determining whether such a violation had occurred. First, the defendant must make out a prima facie case of purposeful discrimination. Then, the state must provide race-neutral explanations for its peremptory strikes. The trial court must then proceed to determine if the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 97-98.

¶17 The Supreme Court also set forth those factors necessary to establish a *prima facie* case of purposeful discrimination: 1) the defendant must show that he or she is a member of a cognizable racial group; 2) the defendant must show that the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire; and 3) defendant must show that such facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory jury selection practice to exclude members of the venire from the petit jury on account of their race. *Batson*, 476 U.S. at 96.

¶18 As indicated above, the standard of review to be applied by an appellate court to a *Batson* challenge depends upon the issue being appealed. If the issue on appeal is a matter of law, such as the timeliness in which a *Batson* challenge is made, the appellate court will review the trial court's application of the law de novo. If the issue is a factual one, however, e.g., whether a party has established a prima facie case for discrimination, an appellate court will defer to the trial court's findings of fact unless clearly erroneous. *Tolbert*, 182 F.3d at 684. Therefore, it is imperative that the trial court fully develop a record for review - a record that includes all relevant facts and information relied upon by the trial court to render its decision, as well as a full explanation of the court's rationale. *United States v. Diaz* (11th Cir. 1994), 26 F.3d 1533, 1994 U.S. App. LEXIS 19495.

¶19 Over the years since *Batson* was decided, the U.S. Supreme Court has expanded Batson's scope and "reaffirmed repeatedly [its] commitment to jury selection procedures that are fair and nondiscriminatory." *J.E.B. v. Alabama ex rel. T.B.* (1994), 511 U.S. 127, 128, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89, 97. For instance, the *Batson* rule no longer applies exclusively to prosecutors striking members of the venire who are the same race as the defendant. Any racially-motivated reason for striking a prospective juror is prohibited under *Batson*, whether the prospective juror shares the racial identity of the defendant or not. *Powers v. Ohio* (1991), 499 U.S. 400, 409, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411, 424. Moreover, the *Batson* challenge is no longer limited exclusively to the government in criminal actions. It has been extended to prevent a defendant in a criminal action from using peremptory challenges to exclude jurors based on race (*Georgia v. McCollum*

(1992), 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33), and has also been applied to private litigants in a civil case. (*Edmonson v. Leesville Concrete Co.* (1991), 500 U.S. 614, 111 S. Ct. 2077, 114 L.Ed.2d 660).

¶20 In addition to their application to racially motivated peremptory challenges, the *Batson* criteria have also been invoked to address other forms of discrimination in the jury selection process. The U.S. Supreme Court has relied on *Batson* to prohibit gender discrimination during jury selection. *J.E.B.*, 511 U.S. 127. On appeal, Ford premises his challenge to the State's use of its peremptory challenges to strike six women from the venire, upon *J.E.B.* and its progeny.

¶21 Ford argues that the State violated his Fourteenth Amendment rights by improperly exercising all of its peremptory challenges to exclude women from the jury panel. The State responds that there was no discriminatory motive underlying its use of peremptory challenges, and that there would be no reason to systematically exclude women from the jury panel in a murder case involving a male defendant and a male victim. However, before we even consider the merits of Ford's claim, we must first evaluate the timeliness of the *Batson* motion. While defendants have a right "to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria," *Batson*, 476 U.S. at 85-86, this right must be exercised in a timely manner. Failure to raise a *Batson* challenge in a timely manner results in the waiver of the challenge. *Morning v. Zapata Protein (USA), Inc.* (4th Cir. 1997), 128 F.3d 213.

¶22 When establishing the elements of a *Batson* challenge, the *Batson* Court did not specify at what point in time in the proceedings an objection must be made in order to be timely. As this is a case of first impression for this Court, we look to other courts for guidance.

¶23 Several jurisdictions have closely analyzed *Batson's* language and concluded that the U.S. Supreme Court envisioned that a *Batson* challenge must be made before the jury is sworn. *State v. Wilson* (1993), 117 N.M. 11, 868 P.2d 656; *United States v. Cashwell* (11th Cir. 1992), 950 F.2d 699, 704; *United States v. Dobynes* (8th Cir. 1990), 905 F.2d 1192, 1196, cert. denied (1990), 498 U.S. 877, 111 S.Ct. 206, 112 L.Ed.2d 167. These courts note that in Footnote 24 of the *Batson* opinion, the U.S. Supreme Court offered the following alternative possibilities upon a finding of discrimination: the court may discharge the venire and select a new jury from a panel not previously associated with the case, or it may disallow the discriminatory challenges and resume selection, with the

improperly challenged jurors reinstated on the venire. Clearly, both of these options presuppose resolution of the objection <u>before</u> a jury is sworn.

¶24 Numerous courts have held that not only must a *Batson* challenge be issued before the jury is sworn, but it must also be raised before the venire is dismissed. *See United States v. Biaggi* (2d Cir. 1990), 909 F.2d 662, 679; *Government of Virgin Islands v. Forte* (3d Cir. 1986), 806 F.2d 73, 76; *Morning*, 128 F.3d at 216; *United States v. Abou-Kassen* (5th Cir. 1996), 78 F.3d 161, 167; *United States v. Rodriquez* (11th Cir. 1990), 917 F.2d 1286, 1288; *State v. Cummings* (Mo. Ct. App. 1992), 838 S.W.2d 4, 6; *Sorensen v. State*, 2000 Wyo. LEXIS 143, 6 P.3d 657, 662; *State v. Harris* (1988), 157 Ariz. 35, 36, 754 P.2d 1139, 1140.

¶25 There are several reasons why a *Batson* challenge must be raised before the jury is sworn and the venire dismissed. The *Wilson* court, embracing the *Cummings* rationale, stated:

> There simply is no justification for defense counsel to wait until the remaining venirepersons are discharged to challenge the state's peremptory strikes. If defense counsel does wait until the venire panel is discharged and the challenge is sustained, then the jury selection process must start anew, and an additional venire panel must be called. This simply delays justice, and, in those jurisdictions where an additional venire is not readily available, the delay can be substantial.

*Wilson, 117 N.M. at 15-16, quoting Cummings, 838 S.W.2d at 6.*

¶26 Additionally, in *Allen v. State* (Tx. Ct. App. 1987), 726 S.W.2d 636, 1987 Tex. App. LEXIS 6672, the Texas Court of Appeals, citing *United States v. Erwin* (5th Cir. 1986), 793 F.2d 656, explained that a *Batson* objection made before the venire is dismissed puts the prosecutor on notice that he or she may be required to provide race-neutral explanations for the peremptory strikes. With the venire still before the prosecutor, he or she has the opportunity to associate the names and faces of the stricken veniremembers with the reasons for striking them. This task becomes very difficult once the persons to whom the peremptories were directed have disappeared from sight, especially where, as here, the defendant challenges as many as six strikes.

¶27 If we allow a *Batson* challenge to be raised after the jury is impaneled and sworn and the venire dismissed, we not only impair the ability of the challenged attorney to

effectively defend his or her strikes, but we also deprive the district court of the ability to correct any error in the proceedings in a timely fashion. While we have not previously addressed the *Batson* challenge explicitly, the concept of requiring a substantive challenge to be brought while the district court still has the opportunity to cure the alleged defect is not novel. We have consistently held that the purpose of a timely objection is to give a district judge the first opportunity to correct any error. *See State v. Tucker*, 2000 MT 255, 301 Mont. 466, 10 P.3d 832; *State v. Clausell*, 2001 MT 62, 305 Mont. 1, 22 P.3d 1111; *State v. Finley* (1996), 276 Mont. 126, 915 P.2d 208 (overruled in part on other grounds by *State v. Gallagher*, 2001 MT 39, 304 Mont. 215, 19 P.3d 817); *State v. Weinberger* (1983), 204 Mont. 278, 665 P.2d 202.

¶28 We conclude that because Ford's counsel waited until after the jury was impaneled and sworn and the venire dismissed to raise his *Batson* challenge, his motion was untimely and was therefore waived. Accordingly, we will not address the merits of his claim.

¶29 The decision of the District Court is affirmed.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ JIM RICE