DA 09-0280

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 175

---

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

VAUGHN JAMES,

      Defendant and Appellant.

---

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC 07-131
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Joslyn Hunt, Chief Appellate Defender; Tammy A. Hinderman,
Eileen A. Larkin (argued), Assistant Appellate Defenders,
Helena, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General; Tammy Plubell (argued),
Assistant Attorney General, Helena, Montana

            Mitch Young, Lake County Attorney, Polson, Montana

---

                       Argued: April 30, 2010
Submitted: May 11, 2010
Decided: August 10, 2010

Filed:

                                _____
                                   Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    James appeals his convictions for felony criminal endangerment and misdemeanor partner or family member assault, following a jury trial in the Twentieth Judicial District Court. We affirm in part and reverse in part.

¶2    James presents the following issues for review:

¶3    Issue One: Whether the District Court properly denied James' motion to dismiss the criminal endangerment charge on the ground of double jeopardy.

¶4    Issue Two: Whether the District Court properly denied James' motion for a mistrial on the ground that the prosecution had used peremptory challenges to remove tribal members from the jury.

¶5    Issue Three: Whether the District Court properly denied James' motion for a new trial based upon the failure to disclose exculpatory evidence.

## BACKGROUND

¶6    On the night of June 28, 2007, James left the Sitting Duck bar at Woods Bay, Montana, followed by Tracy Shaw who had sometimes been identified as his common law wife. The two were having an argument, and James turned around and struck Shaw in the head causing her to fall to the ground. Patrons of another establishment across the street saw the incident and ran to provide aid to Shaw. She denied that she had been hit or that she was injured, but refused to leave with James. The Good Samaritans noted a "red mark" on Shaw's face.

¶7 A Lake County deputy sheriff responding to the incident passed a vehicle fleeing the area at a high rate of speed that matched the description of James' car. The deputy turned around and gave chase. James' vehicle reached speeds at or near 100 miles per hour, and the deputy observed James pass other vehicles at high speed in no-passing areas. James eventually wrecked his car and was taken into custody. The deputy determined that James was a member of the Confederated Salish and Kootenai Tribes, and turned him over to a Tribal law enforcement officer pursuant to local protocol.

¶8 Meanwhile, Shaw was arrested by other officers that same evening for a probation violation. She was photographed and booked into the Lake County jail.

¶9 On June 29, 2007, James was charged in Tribal Court with one count of DUI and one count of fleeing from or eluding a peace officer. The fleeing charge was based upon "knowingly fleeing from an Officer who was attempting to stop the vehicle by traveling at a high rate of speed and/or making improper passes." On July 16, 2007, James was charged in State court with criminal endangerment under § 45-5-207, MCA, based upon "passing in no passing zones and driving his vehicle at speeds up to 100 mph on Highway 35." The State later filed an amended information charging James with the additional offense of partner-family member assault for striking Shaw.

¶10 In December, 2007, James entered a plea agreement to the Tribal Court charges, pursuant to which he pled guilty to the charge of eluding a peace officer, and the court dismissed the DUI charge. The Tribal Court sentenced James to serve 90 days, with 78 days suspended for a year. James was then tried in State court and was convicted of both State charges after a jury trial in November, 2008. On February 26, 2009, the District

3

Court sentenced James as a persistent felony offender to a term of 30 years with 22 years suspended for the criminal endangerment conviction, and to a term of 6 months with all but 116 days suspended, with credit for 116 days served, on the partner-family member assault conviction.

¶11 Other facts relevant to this appeal will be discussed below.

## DISCUSSION

¶12 *Issue One: Whether the District Court properly denied James' motion to dismiss on the ground that he had been exposed to double jeopardy.* The District Court's decision on a motion to dismiss in a criminal case is an issue of law which this Court reviews de novo. *State v. Gazda*, 2003 MT 350, ¶ 10, 318 Mont. 516, 82 P.3d 20.

¶13 Montana law provides:

> When conduct constitutes an offense within the jurisdiction of any state or federal court, a prosecution in any jurisdiction is a bar to a subsequent prosecution in this state if: (1) the first prosecution resulted in an acquittal or in a conviction and the subsequent prosecution is based on an offense arising out of the same transaction.

Section 46-11-504, MCA. "Same transaction" is defined by statute as "conduct consisting of a series of acts or omissions that are motivated by: (a) a purpose to accomplish a criminal objective and that are necessary or incidental to the accomplishment of that objective." Section 46-1-202(23), MCA. Section 46-11-504, MCA, provides greater protection against double jeopardy than the "elements" test applied under Federal law. *Gazda*, ¶ 12.

¶14 The question here is whether the Tribal and State charges arose out of the "same transaction" for purposes of § 46-1-202(23), MCA. The District Court denied James'

4

motion to dismiss on the ground that the Tribal Court charge of fleeing or eluding a police officer did not require proof of creating a substantial risk of death or serious bodily injury that was necessary to support the State's charge of criminal endangerment.

¶15 We conclude that the District Court's conclusion was incorrect. Both charges were based upon exactly the same conduct by James--driving the car dangerously and at a high rate of speed. His criminal objective was the same with regard to either offense--he intended to drive as fast and as recklessly as required to elude the pursuing officer and avoid apprehension. The conclusion that the two charged offenses arose from the same transaction is not affected by the fact that the offenses have different elements. *State v. Nuefeld*, 2009 MT 235, ¶¶ 19-20, 351 Mont. 389, 212 P.3d 1063. James' criminal objective--driving at high speed to elude capture--was the same as to each charge.

¶16 In *Gazda*, by contrast, the Federal charge of being a felon in possession of a firearm did not involve the same criminal objective as the State charge of deliberate homicide. Therefore, this Court held that the conviction on the Federal charge did not preclude State prosecution for the homicide. *Gazda*, ¶ 22. *See also Nuefeld* (guilt on Federal charges of sexual exploitation of children barred State prosecution for sexual intercourse without consent); *State v. Cech*, 2007 MT 184, 338 Mont. 330, 167 P.3d 389 (conviction in another state of possession of a car originally stolen in Montana precluded subsequent Montana charge of obtaining unauthorized control over the same vehicle). By contrast, in *State v. Tadewaldt*, 277 Mont. 261, 922 P.2d 463 (1996), the defendant was charged with DUI and convicted in municipal court. He was later charged in State court with possession of dangerous drugs found during a search of his vehicle at the time

5

of the DUI. This Court affirmed the State court conviction because ingesting unknown intoxicants that led to the DUI offense, and possessing the drugs that led to the possession charge were separate events. The two offenses had different criminal objectives and therefore arose from separate transactions; maintaining both charges did not violate the defendant's protection against double jeopardy.

¶17 Therefore, James' conviction for criminal endangerment was barred by § 46-11-504, MCA. His conviction is reversed and the case is remanded to the District Court with instructions to dismiss the charge.[1]

¶18 *Issue Two: Whether the District Court properly denied James' motion for mistrial based upon the contention that the prosecution's use of a peremptory challenge was improperly based upon race.* In this context, this Court defers to the trial court's findings of fact unless they are clearly erroneous, and reviews the district court's application of the law de novo. *State v. Ford*, 2001 MT 230, ¶ 7, 306 Mont. 517, 39 P.3d 108. Because we have reversed James' conviction for criminal endangerment, this issue now pertains only to the remaining conviction for partner-family member assault.

¶19 During voir dire, prospective juror Mackey disclosed that there was a class required for his job scheduled for all the next week and that he absolutely could not miss attending. He stated that as long as the trial did not go into the next week, he would be "on board" to serve as a juror. Prospective juror Rogers at that point volunteered that she

---

[1] James argued for the first time in his reply brief on appeal that the State lacked jurisdiction to prosecute him for criminal endangerment based upon various agreements between the State of Montana and the Confederated Salish and Kootenai Tribes. Because we reverse James' conviction we do not reach this issue.

6

also was taking a course for her job and was missing classes and mid-term tests at that very moment. She said that serving as a juror would be a "time constraint" for her but that she was willing to serve.

¶20 After the prosecution completed voir dire, defense counsel asked the panel if any were tribal members. Prospective jurors Rogers and Durglo[2] responded affirmatively. Defense counsel then asked whether "Mr. James being Native" concerned them:

> Mr. Larrivee: . . . What it comes down to, though, is are your feelings such that if you are sitting over there, that your feelings are so strong that, yeah, I really couldn't be fair about that.

> Mr. Durglo: I think so. It would probably sway me the way I think because our own tribal system we got our own court system, why he's not in our court system instead of--

> Mr. Larrivee: Actually it's going to come out that he was in your court system. . . . I want to be able to tell you that, yes, that's an element of this case and, yes, there was more that occurred in Tribal Court.

> Mr. Durglo: Yeah. It would probably sway me because how come they didn't finish it in our court system?

> . . .

> Mr. Larrivee: . . . Because, you know, again, your decision has to be based on what you hear on the witness stand.

---

[2] James asserts on appeal that he is challenging the prosecution's use of peremptory challenges as to both Rogers and Durglo. James' opening brief on appeal discusses only juror Rogers and makes no argument of any kind as to juror Durglo. The State understandably concluded from the opening brief that juror Durglo was not in issue and argued only the circumstances concerning Rogers. James' reply brief, for the first time, asserted that Durglo was also in issue and presented arguments. As noted above, James also waited until his reply brief to make jurisdictional arguments for the first time. This is unacceptable appellate practice and conflicts with the briefing requirements of Rule 12, M. R. App. P., and particularly Rule 12(3). In this case we will consider the issue regarding juror Durglo because of its similarity to the important issues regarding juror Rogers.

7

Mr. Durglo: Yes.

Mr. Larrivee: Okay. Recognizing that and your understanding of Tribal Court and Tribal Court proceedings.

Mr. Durglo: Yeah. That's why I kind of questioned how it come to become a felony.

. . .

Mr. Larrivee: Okay. Are you okay with that right now?

Mr. Durglo: I don't know. Now I got a doubt now.

Mr. Larrivee: Okay. A doubt about this process or you as a juror? Help me.

Mr. Durglo: As a juror I think I might have a problem.

Mr. Larrivee: . . . But is your concern based upon, you know, the fact that Mr. James is native and that this—is it your feeling that this matter should have been resolved entirely in Tribal Court?

Mr. Durglo: The concern I got with this for the two, misdemeanor or for felony?

Mr. Durglo then expressed concern that James had been charged with a felony so he could be prosecuted in State court, and the District Court interrupted and gave an explanation of State-Tribal jurisdiction. Mr. Larrivee then asked Mr. Durglo whether he could be fair and listen to both sides and Mr. Durglo said "yeah, I think so."

¶21 The prosecution struck prospective jurors Rogers and Durglo using its peremptory challenges. Defense counsel moved for a mistrial under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986), because the prosecution had removed the two prospective jurors who identified themselves as tribal members. In response, the prosecution explained that Durglo had been challenged because of his concern that James had been charged in State

8

court; because he was concerned that Tribal Court was being improperly by-passed; and because he believed that James was in State court only to allow a felony charge. The prosecution explained that Rogers was challenged because of her concern over classes and tests that she would have to miss if she served on the jury.

¶22 The District Court denied the motion for a mistrial after hearing argument of counsel.

¶23 A litigant may use allotted peremptory challenges without having to establish that the prospective juror should be dismissed for cause and without having to state a reason. *Ford*, ¶ 14. In *Batson* the United States Supreme Court curtailed the unrestrained use of peremptory challenges by holding that it was a violation of equal protection for the prosecution in a criminal case to remove prospective jurors solely on the basis of race. *Ford*, ¶ 15. *Batson* requires that a defendant must establish a prima facie case of purposeful discrimination, and if he does so then the prosecution must provide race-neutral explanations of its peremptory strikes. The trial court then must determine whether the defendant has established purposeful discrimination. *Ford*, ¶ 16.

¶24 In the present case the District Court found that James had established a prima facie case of discrimination by showing that the prosecution had removed the only two prospective jurors who identified themselves as tribal members. The District Court then examined the prosecutor's explanations of the reasoning behind the challenges. As to juror Durglo, the prosecutor explained that he was challenged because of his concern over where the charges had been filed and his belief that the process reflected a disrespect for the status of the Tribal Court system: "I was uncomfortable with, with the discussion

that happened about the jurisdictional issue with Tribal Court. And—well, quite frankly I was uncomfortable that he didn't have some concerns this was—that this matter shouldn't be tried in this court." After defense counsel responded that Durglo's comments were a "reflection of his Native American ethnicity," the prosecutor stated: "I will tell the Court that my concerns are based on his comments regarding the jurisdictional issue. And I would have the same feelings if it was with a white person, Chinese person, or otherwise expressing those feelings." The District Court stated that it "shares some of the concerns that were raised by Mr. Durglo, not on the basis of his race but on the basis of his concern about where the charges were filed and the confusion with regard to were they appropriately filed in this court or were they appropriately filed in another court."

¶25 The District Court also shared the prosecutor's concerns that these jurisdictional issues should not be aired during jury deliberations, and that there was "no way other than to utilize a peremptory challenge to address that issue and to keep the case in a neutral position." The District Court analyzed the situation under the *Batson* test and determined that the prosecution's peremptory challenge of Durglo was not "done on the basis of race as much as it was on the basis of his expressed concern that these charges were inappropriately filed."

¶26 Turning to prospective juror Rogers, the District Court found that while prospective juror Mackey was also concerned about being able to attend classes but was not challenged, Mackey's concerns arose only if the trial went into a second week. All involved agreed that it was improbable that the trial would last that long. The challenged

10

juror, Rogers, by contrast, had a "specific and very forceful concern" that she was missing class to attend trial.[3] When additionally considering a third prospective juror challenged by the prosecution, the District Court concluded that the common thread was to remove "the people who represented on the record that they really didn't want to be present."

¶27 We agree with the District Court's analysis of juror Durglo. Defense counsel's only response to the prosecutor's explanation of the peremptory challenge was that Durglo's comments were "a reflection of his Native American ethnicity." Prohibiting use of a peremptory challenge whenever voir dire answers reflect Native American ethnicity could prohibit challenging prospective jurors who express a belief, for example, that the defendant must be innocent because he is a tribal member or a belief that the police always use false evidence against tribal members. We do not construe *Batson* to require that a juror whose beliefs are likely to interfere with the fairness of the trial be seated whenever there is a claim that those beliefs reflect an ethnic identity.

¶28 We give the District Court's factual findings concerning the three-part *Batson* test deference, *Ford*, ¶ 18. The District Court presided over voir dire, heard the questions and the responses from the prospective jurors, heard the responses and arguments of the attorneys, and observed their demeanor. The District Court was in the best position to

---

[3] James concedes on appeal in his opening brief that the prosecution provided a race-neutral reason for striking Rogers. In his reply brief James argued that the reason for striking Rogers was not race neutral, without acknowledging or distinguishing the concession made in his opening brief. This, again, is unacceptable appellate practice and a violation of briefing obligations under M. R. App. P. 12. We hold James to the concession made in his opening brief.

11

evaluate these matters and we find no reason to conclude that there was error. The argument that Durglo's feelings arose from his Tribal membership fails, without more, to establish that there was purposeful discrimination based upon race, as required to establish a *Batson* violation. The District Court properly concluded that there was no violation of *Batson* and properly denied James' motion for a mistrial.

¶29 *Issue Three: Whether the District Court properly denied James' motion for a new trial based upon his contention that the prosecution had negligently suppressed exculpatory evidence.* A district court's decision on a motion for new trial is reviewed for abuse of discretion. *State v. Clark*, 2008 MT 391, ¶ 20, 347 Mont. 113, 197 P.3d 977.

¶30 This issue pertains to James' conviction of partner-family member assault. During the State court proceedings James served discovery requests on the State, specifically including a request for evidence that would mitigate or negate guilt. The State filed responses in which it represented that it had made "full discovery disclosure as requested" by James, and that it had disclosed "all exculpatory evidence in its possession."

¶31 After James' State court conviction his attorney learned that Shaw, the victim of the assault, had been arrested the night of the incident, and that she had been photographed during booking. It is uncontested that the booking photo of Shaw does not show any visible injury. Shaw was not called by either side to testify at trial, although both sides interviewed her prior to trial. Neither the defense attorney nor the prosecuting attorney specifically knew before conviction that Shaw had been photographed.

12

¶32 James contends that the State's failure to produce the booking photograph violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and that his conviction for partner-family member assault must be reversed. Under *Brady* suppression of material evidence favorable to the accused violates his right to due process. *State v. Johnson*, 2005 MT 318, ¶ 12, 329 Mont. 497, 125 P.3d 1096. The defendant has the burden to show that the State possessed evidence favorable to the defense; that the defendant did not have the evidence and could not have obtained it with reasonable diligence; that the prosecution suppressed the favorable evidence; and that if the evidence had been disclosed there is a reasonable probability that the outcome of the proceeding would have been different. *Id.*

¶33 The District Court denied James' motion for a new trial. Based upon the briefs, affidavits and pleadings, the District Court found, among other things, that both parties knew prior to trial that Shaw had been arrested the night of the incident; that it was common knowledge that booking photos are taken of persons who are arrested; that a booking photo of Shaw exists; and that "any photo" of Shaw would show no physical injury. The District Court also found that the defense interviewed Shaw prior to trial; that witnesses called at trial testified that Shaw refused medical care; and that the witnesses did not testify that Shaw had visible injuries. The fact that Shaw had no visible injury was not contested by the State. James does not contend that the State purposely withheld the booking photo; neither prosecution nor defense counsel knew of the existence of the photo at the time of trial.

13

¶34 The District Court concluded that the defense could have discovered the booking photo with reasonable diligence based upon the opportunity to interview Shaw and counsel's familiarity with booking procedures. The District Court further concluded that since the photo was consistent with the testimony of third-party witnesses and since it was uncontested that Shaw did not have a visible injury, there was "no reasonable probability" that the outcome would have been different if the photo had been discovered earlier.

¶35 James counters that photographs are inherently "highly persuasive evidence" and therefore there was "more than a reasonable probability" that the photo would have resulted in an acquittal on the assault charge. James also contends that he had no duty to find the evidence prior to trial and that there was no "independent source" for the photo except through the prosecution.

¶36 The District Court did not abuse its discretion in denying James' motion for a new trial. As the District Court found, the booking photo would have been cumulative to the eyewitness accounts of the events. The absence of visible injury was not contested by the State. Both the prosecution and the defense had access to Shaw prior to trial and neither attorney specifically knew about the booking photos. If the State should have discovered them in the exercise of due diligence, then so should the defense. And, other than asserting that photographs are persuasive evidence, James has failed to demonstrate that the outcome of the trial would have been different if the jury had seen the booking photo.

¶37 The District Court's findings are not clearly erroneous and its conclusions were correct.

14

¶38 Affirmed in part and reversed in part and remanded with instructions to vacate the conviction and sentence for criminal endangerment.

_/s/ Chief Justice_

Chief Justice

We concur:

_/s/ Justices_

Justices

Justice Jim Rice, concurring in part and dissenting in part.

¶39 I concur with Issues Two and Three, but dissent from Issue One because I believe the Court's analysis fails to properly apply § 46-11-504, MCA, in accordance with our jurisprudence and sets an unfortunate precedent.

¶40 The Court acknowledges that the Tribal charge of eluding a peace officer and the State charge of criminal endangerment have differing elements but summarily concludes that, in James's case, they were based upon conduct with the same criminal objective— "he intended to drive as fast and as recklessly as required to elude the pursuing officer and avoid apprehension." Opinion, ¶ 15. However, this is actually an amalgamation of criminal intentions, including the intention to endanger others and the intention to elude a police officer. One need only recall O. J. Simpson's infamous low-speed drive away from police in Al Cowling's white Ford Bronco to vividly illustrate the differences in criminal objectives here:

> Word of the flight soon went out, and the crowds were on their feet, cheering. Police picked up O.J.'s cellular-phone calls and began tracking the Ford Bronco along the San Diego Freeway. Reporters pursuing in helicopters overhead said that he had a gun to his head. People pulled up their lawn chairs to the side of the road to wait for the cortege to pass. They lined the overpasses, waving, shouting, holding up signs -- Go O.J. Go -- as if he were trying to elude a pack of motorized tacklers.

Nancy Gibbs, O. J. Simpson: End of the Run, 143 Time 28 (June 27, 1994). O. J.'s quixotic quest had not been done recklessly and had not endangered but, nonetheless, he

had exhibited the criminal objective of eluding police.[1] These two objectives are different.

¶41 Under the Court's logic, if James had collided with another car and recklessly killed someone, the Tribal charge of eluding police would prohibit the State from charging James with the homicide. This outcome is not required under our precedent.

¶42 In *State v. Tadewaldt*, 277 Mont. 261, 922 P.2d 463 (1996), we considered whether the defendant's conviction of driving under the influence of drugs barred a prosecution for possession of drugs found in his car. In concluding it did not, we focused on the criminal objective of DUI—ingesting drugs and driving a vehicle while under the influence of that substance—and the different criminal objective of simply possessing dangerous drugs. *Tadewaldt*, 277 Mont. at 267.

¶43 In *State v. Gazda*, 2003 MT 350, 318 Mont. 516, 82 P.3d 20, we concluded that § 46-11-504, MCA, did not bar State prosecution for deliberate homicide after the defendant had already been convicted in federal court of possessing the murder weapon. We explained that since the "federal prosecution only pertained to whether Gazda's 'criminal objective' was to knowingly and unlawfully possess his .30-.30 rifle . . ." his conviction for that charge did not bar the State prosecution because "the State had to demonstrate that Gazda purposefully or knowingly caused the death of another human being through deliberate homicide." *Gazda*, ¶¶ 22-23. We held that where the criminal objective of each charge is distinct, the "same transaction" element of our double

---

[1] Police followed the slow moving Bronco back to Simpson's Brentwood mansion, where Simpson was arrested.

17

jeopardy analysis is not met and § 46-11-504, MCA, does not bar the subsequent prosecution. *Gazda*, ¶ 24. Such distinct elements of the offenses likewise exist here.

¶44    In *State v. Cech*, 2007 MT 184, 338 Mont. 330, 167 P.3d 389, we considered whether the defendant's conviction in the State of Washington of possessing a car that he had stolen in Montana barred his subsequent prosecution in Montana for felony theft of the same vehicle. We held that § 46-11-504, MCA, barred prosecution of Cech on the Montana theft charge, explaining that "Cech's underlying conduct which served as a basis for *both prosecutions sought to accomplish the same criminal objective--control of the stolen vehicle.*" *Cech*, ¶ 22 (emphasis added).

¶45    This "same criminal objective" clearly does not exist here. Simply put, the criminal objective of eluding a peace officer is exactly that—to elude a peace officer. The criminal objective of criminal endangerment is creating a substantial risk of death or serious bodily injury to another. As the District Court pointed out, a person may flee from an officer without creating a substantial risk of death or serious bodily injury, and conversely, a person can create a substantial risk of death or serious bodily injury on the roadway without an officer being in pursuit of that person.

¶46    I would affirm the District Court.

_____
                                         Justice

18

Justice W. William Leaphart, dissenting.

¶47    I dissent on Issue Two. The Court does not fully engage in the required *de novo* analysis of the District Court's application of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986). As the Court states in the Opinion, we review a district court's application of the law *de novo*. *State v. Ford*, 2001 MT 230, ¶ 7, 306 Mont. 517, 39 P.3d 108. If the Court engaged in thorough *de novo* review, it would have uncovered the State's failure to meet the second prong of the *Batson* test, which requires that the prosecutor articulate a race-neutral explanation for exercising its peremptory challenge. *State v. Ford*, ¶ 16. A careful review of the transcript reveals that the explanation offered by the prosecutor was categorically *not* race-neutral under the standards established by *Batson* and its progeny.

¶48    To satisfy the second prong of *Batson*, the prosecutor must give a "clear and reasonable specific" explanation of his "legitimate reasons" for exercising the challenges. *Batson*, 476 U.S. at 98, n. 20 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S. Ct. 1089, 1096 (1981). The U.S. Supreme Court later clarified this language, explaining that "legitimate reasons" must be those that do not deny equal protection. *Purkett v. Elem*, 514 U.S. 765, 769, 115 S. Ct. 1769, 1771 (1995). A denial of equal protection occurs if the decision-maker selected a particular course of action "at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." *Hernandez v. New York*, 500 U.S. 352, 36, 111 S. Ct. 1859, 1866 (1991) (citing *Personal Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296 (1979)). This Court has held the following justifications to be race-neutral: a potential juror's familial relation to the defendant, a potential juror's personal experience and

19

resulting biases related to assault cases, and a potential juror's friendship with the defense attorney. *State v. Falls Down*, 2003 MT 300, ¶ 48, 318 Mont. 219, 79 P.3d 797; *State v. Barnaby*, 2006 MT 203, ¶ 55, 333 Mont. 220, 142 P.3d 809. Here, it is apparent from the transcript—evaluated in greater detail below—that the prosecutor devised a course of action "at least in part because of" its adverse effects on an identifiable group.

¶49 The prosecutor in James's case asserted that he excluded Durglo because Durglo had expressed concerns over Tribal versus State court jurisdiction. However, race was inherent in his explanation. That is, excluding a Native American as a juror because of that person's concern with Tribal court jurisdiction is not a race-neutral justification.[1] In addition to the justification speaking for itself, its non- race-neutral nature is supported by the District Court's own observations during the *Batson* analysis and Durglo's responses during *voir dire*, at which the prosecutor was present. After the prosecutor offered his explanation, the Court observed that Durglo's concern carried with it "the sense that somehow that was a disrespect to the Tribal Court." An analysis of Durglo's responses in *voir dire*, which were the source of the prosecutor's challenge, demonstrates that Durglo's own Native American heritage and his views on the Tribal Court were inextricably linked. Durlgo's *voir dire* responses are germane to *Batson*'s second step

---

[1] The prosecutor averred that his concerns about Durglo were "based on his comments regarding the jurisdictional issue. And I would have the same feeling if it was with a white person, Chinese person or otherwise expressing those feelings." However, the U.S. Supreme Court held in *Batson* that such justifications fail under the second prong because they "rebut the defendant's case by merely denying that he had a discriminatory motive" or affirming that he had "good faith" in making the selections. *Batson*, 476 U.S. at 98.

because the standard demands an inquiry into the source of the justification, which was Durglo's response to questioning in *voir dire*.

¶50 In *voir dire*, prospective jurors were asked to indicate whether they were enrolled or enrollable members of a tribe or had some tribal affiliation. Only two jurors responded: Durglo and Rogers. The two self-identified tribal members were then asked whether their "feelings such that if you were sitting over there, that your feelings are so strong that, yeah, I couldn't be fair about that." Durglo responded: "It would probably sway me the way I think, because our own tribal system we got our own court system, why he's not in our court system . . . ." It is obvious from Durglo's responses that his identified tribal affiliation and concomitant views about his own tribe's court system were inseparable. Because the second prong requires an inquiry into the source of a prosecutor's explanation (to determine whether the prosecutor exercised the peremptory challenge "at least in part because of" its adverse effects on an identifiable group), the origin of the prosecutor's concern is both relevant and illuminating. The prosecutor's explanation arose out of Durglo's unconcealed, tribal membership-based concern over why the case was not in "our court system." Durglo's use of the phrase "we got our own court system" suggests more than just a clinical concern about jurisdiction—a fact that was surely not lost on the prosecutor. In conjunction with the prosecutor's later explanation, it is apparent that the justification was offered, at least in part, because of its adverse effect on an identifiable group: Native Americans.

¶51 It is clear from the record that a *Batson* violation occurred. It is this Court's responsibility to review the District Court's application of the law *de novo*. I therefore dissent to the Court's lack of analysis in Issue Two.

W. William Leaphart
Justice