Justice Jim Rice delivered the Opinion of the Court.
***18 ¶1 Cathie Iris Warren (Warren) appeals her conviction of three felony counts of aggravated animal cruelty, five felony counts of cruelty to animals, and a misdemeanor count of cruelty to animals, after jury trial in the Nineteenth Judicial District Court, Lincoln County. We affirm, and state Warren's issues on appeal as follows:
1. Did the District Court err by denying Warren's motion to suppress evidence obtained in warrantless searches of her commercial kennel property?
2. Did the District Court err by denying Warren's Batson challenge?
3. Did the District Court err in imposing the costs to be reimbursed by Warren under § 45-8-211(3), MCA ?
FACTUAL AND PROCEDURAL BACKGROUND
¶2 This case arises from Warren's kennel operation located on her residential property in Libby, Montana. In August 2013, Warren submitted an Animal Control Business Kennel Application to Lincoln County in which she stated she would (1) hold dogs for sale or ***19 exchange; (2) breed, buy, sell, or barter dogs for profit or compensation; and (3) buy or receive dogs, and thereafter exhibit or offer such animals for sale, trade, or barter. Warren's application indicated the kennel was already in operation, and she publicly advertised the location of her kennel and that it was open for business. Pursuant to the application process, Warren's property was inspected by Lincoln County in 2013, and she was issued a license to operate.
¶3 In 2016, Lincoln County Animal Control employee Wendy Anderson (Anderson) received a noise complaint regarding barking dogs on Warren's property. Anderson discovered that, despite expiration of Warren's kennel license in October 2015, Warren was apparently still operating a commercial kennel. Anderson contacted Warren and explained that a new kennel license needed to be obtained, which would require an inspection of her property pursuant to county ordinance, as had occurred in 2013. Warren agreed and scheduled an inspection with Anderson, pending which Anderson issued Warren a conditional kennel license.
¶4 The purpose of these inspections is to ensure the kennel facility is suitable for the number of animals present, and is not creating a health risk. Lincoln County Ordinance 7.1.306. The inspections are not designed to be criminal investigations, and a prospective kennel licensee is free to decline an inspection, in which case the application for the license will not be processed.
¶5 Ultimately, three inspections of Warren's property occurred in 2016. The first, on April 21, 2016, was scheduled with Warren and performed by Anderson and Kathi Hooper *360 (Hooper), Director of the Lincoln County Health Department. During the inspection, Hooper and Anderson followed Warren through her property and inspected those areas as directed by Warren, including rooms inside her home, a barn, a kennel located in the nearby woods, and a metal horse trailer. As Hooper would testify, during this inspection she observed more than fifty poodles with matted hair located in inadequately small areas for the size of the dogs, leaving her concerned for the health of the animals. After this inspection, Anderson attempted to bring Warren into compliance with licensing requirements, and requested that Warren produce rabies vaccinations certificates, by May 10, 2016, for her dogs that were over six months old. In response, Warren provided the Animal Control Office with 132 rabies vaccination certificates for her approximately fifty dogs, without identifying which certificate corresponded to each dog. After reviewing the certificates, the Animal Control Office determined that some certificates corresponded to animals no longer in Warren's possession, while there were no ***20 certificates for some dogs that remained in her possession.
¶6 Because Warren had not timely provided satisfactory verification, Anderson wrote a letter on June 7, 2016, advising Warren that she had failed to satisfy the conditions of the conditional kennel license, and that her previous kennel license had expired on October 31, 2015, thus requiring her to submit a new kennel application for processing. Warren submitted a new application dated June 10, 2016, after which Hooper and Anderson scheduled another kennel inspection with Warren for June 30, 2016. Lincoln County Sheriff Roby Bowe (Sheriff Bowe) accompanied Hooper and Anderson on this inspection, pursuant to Hooper's practice of requesting law enforcement assistance to keep the peace if she believed an inspection could be contentious. During this inspection, Hooper and Anderson observed approximately fifty-nine dogs on the property, along with horses, donkeys, goats, chickens, and small birds. The inspection raised concerns by Hooper and Anderson about the health of the animals and the conditions of the facilities. Additionally, Warren could not provide appropriate vaccination records for her animals.
¶7 Acting on their concerns, Lincoln County Animal Control scheduled a third inspection with Warren for July 26, 2016, to be conducted by Dr. Melissa Genovese, a veterinarian, to further determine the health of the animals and the conditions of the facilities. Dr. Genovese was accompanied by a veterinary technician and Sheriff Bowe. After the inspection, Dr. Genovese recommended the animals be evaluated by the U.S. Humane Society, because, in her opinion, the animals were not receiving adequate care. There were approximately fifty-two dogs on the property, despite a limit of twenty dogs stated on Warren's license application; dogs were kept in stacked crates that were too small; dogs were housed inside Warren's residence in crates, inside a barn, inside the kennel in the woods, or locked inside a metal horse trailer, often in direct sunlight or exposed to eighty-five or ninety degree temperatures; dogs either had no access to food or water or were being fed cat food; and most dogs were either underweight or emaciated and had severe fur matting and ear or eye infections. There were also cats, goats, canaries, parakeets, and mules on Warren's property. The mules were underweight, had long, shaggy coats despite high temperatures, and their hooves were long and curved upwards.
¶8 After the inspection by Dr. Genovese on July 26, Sheriff Bowe asked Detective Dave Hall to investigate Warren for possible animal cruelty. Hall obtained reports from Hooper, Anderson, and Dr. Genovese concerning Warren's animals and facilities, and obtained a search warrant based on those reports. Detective Hall served the ***21 search warrant on Warren's property on August 2, 2016. Warren's animals were seized the same day, and she was subsequently charged with seventeen felony and misdemeanor animal cruelty offenses.
¶9 Warren moved to suppress the evidence obtained in the three 2016 searches of her property, arguing a warrant was required for each inspection. The District Court found Warren "was operating a business that implicated public health and safety and the well-being of the animals being bought, sold, bred, *361 traded, or bartered," which was "open to the public, the address was advertised to the public," and that Warren both initiated the inspections and controlled the areas inspected. The court concluded there was no search because Warren did not have an expectation of privacy in her commercial kennel operation that society would consider objectively reasonable, and denied the motion.
¶10 The case proceeded to trial. After voir dire, the State used a peremptory strike to remove Felipe Jara-Pereira, a Hispanic male, from the jury panel. The defense objected to the strike on the basis of Batson v. Kentucky , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), as a violation of equal protection because Jara-Pereira was "the one minority juror on the panel." The prosecutor responded that the strike was "not anything to do with any sort of race or ethnic background," but, rather, because the prosecution "didn't get to" several of the jurors during questioning, it knew "a little bit less" about them, and thus had struck jurors it had not questioned, including Jara-Pereira, even though the prosecutor "didn't have a lot of great concerns" about anyone on the panel. The District Court overruled the objection, stating "we have a female Defendant who is not Spanish," and thus, concluded no Batson violation had occurred. Both parties used all eight of their peremptory strikes. Trial proceeded and Warren was convicted of eight felony counts and one misdemeanor count.
¶11 At sentencing, a primary issue was the amount of restitution or costs owed by Warren to Lincoln County. The Lincoln County Animal Control shelter in Libby cared for Warren's animals for over ten months until they were healthy enough to be fostered or adopted. Extensive care was needed to bring the animals back to health, including veterinary care for ear infections, eye infections, urinary tract infections, giardia, worms, tooth removal, overgrown hooves, and tumor removal. Lincoln County was responsible for the care of sixty-seven dogs and six donkeys, which overwhelmed their facilities so that they could not conduct normal animal control activities.
¶12 The District Court found that Lincoln County was a victim that suffered pecuniary loss under § 46-18-243, MCA, and calculated costs ***22 according to Montana's Animal Cruelty statute, § 45-8-211(3), MCA. The court determined that Warren owed statutorily-imposed costs, including for veterinary care, food and supplies, excess hours worked by county employees, and travel costs. Also included were costs incurred for (1) contracted sheltering with Tobacco Valley Animal Shelter (TVAS), a private, non-profit shelter in Eureka that Lincoln County contracted with to shelter county animals; and (2) lost revenue, calculated as the difference between the 2016 and 2015 revenue for the ten-month period that Lincoln County cared for Warren's animals, because the County was "unable to conduct normal animal control business, and the shelter, primarily [TVAS], was unable to take in or adopt out animals" and thus could not earn revenue from adoption fees. The District Court sought clarification on the lost revenue amount during the hearing, and asked Hooper:
[The Court]: There's a contract amount which [Lincoln County] pays [TVAS] every month.
[Hooper]: Yes.
[The Court]: Okay. Then there was added costs above and beyond the contract amount that you paid them, correct?
[Hooper]: Yes.
¶13 The State originally sought a total of $ 72,109.00, but the court subtracted care for parakeets, which were not part of the animal cruelty case, and reduced the amount of lost revenue claimed, imposing a total of $ 67,432.42.
¶14 Warren appeals her conviction and sentence.
STANDARD OF REVIEW
¶15 "We review a district court's denial of a motion to suppress to determine whether the court's findings are clearly erroneous and whether those findings were applied correctly as a matter of law." State v. Foster , 2017 MT 118, ¶ 6, 387 Mont. 402, 394 P.3d 916.
¶16 "[W]hen considering a Batson challenge, i.e., a challenge that a litigant has *362 exercised its use of peremptory strikes in a discriminating manner, an appellate court will defer to the trial court's findings of fact unless clearly erroneous, and will review the trial court's application of the law de novo." State v. Ford , 2001 MT 230, ¶ 7, 306 Mont. 517, 39 P.3d 108 (citing Tolbert v. Page , 182 F.3d 677 (9th Cir. 1999) and Brewer v. Marshall , 119 F.3d 993 (1st Cir. 1997) ).
¶17 Finally, "[w]e review a district court's imposition of a criminal sentence for legality. We review the trial court's interpretation on sentencing questions regarding statutory interpretation to determine whether it is correct."
***23 State v. Barnaby , 2006 MT 203, ¶ 56, 333 Mont. 220, 142 P.3d 809 (citation omitted).
DISCUSSION
¶18 1. Did the District Court err by denying Warren's motion to suppress evidence obtained in warrantless searches of her commercial kennel property?
¶19 Warren argues the three warrantless inspections of her commercial kennel property by Lincoln County officials were illegal searches under the Fourth Amendment to the United States Constitution. Warren has not challenged the searches under the Montana Constitution, and explicitly disclaims such claims.[1]
¶20 The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. Const. amend. IV. This protection extends to both private homes and commercial residences, New York v. Burger , 482 U.S. 691, 699, 107 S.Ct. 2636, 2642, 96 L.Ed.2d 601 (1987) ; See v. City of Seattle , 387 U.S. 541, 543, 546, 87 S.Ct. 1737, 1739, 1741, 18 L.Ed.2d 943 (1967), and applies to both police searches and "administrative inspections designed to enforce regulatory statutes." Burger , 482 U.S. at 700, 107 S.Ct. at 2642 ; Marshall v. Barlow's, Inc ., 436 U.S. 307, 312-13, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978). Thus, the Fourth Amendment was implicated when Lincoln County officials inspected Warren's commercial kennel without a warrant.
¶21 The initial inquiry is whether the government conduct in question constitutes a search. State v. Goetz , 2008 MT 296, ¶ 25, 345 Mont. 421, 191 P.3d 489 (citation omitted); see also United States v. Jacobsen , 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). To determine whether a search occurred, this Court first considers " 'whether the person challenging the state's action has an actual subjective expectation of privacy,' " State v. Allen , 2010 MT 214, ¶ 47, 357 Mont. 495, 241 P.3d 1045 (citation omitted); accord Kyllo v. United States , 533 U.S. 27, 33, 121 S.Ct. 2038, 2042-43, 150 L.Ed.2d 94 (2001). We then consider ***24 " 'whether society is willing to recognize that subjective expectation [of privacy] as objectively reasonable.' " Allen , ¶ 47 (citation omitted); accord Kyllo , 533 U.S. at 33, 121 S.Ct. at 2042-43. If both factors are not met, a search has not occurred. Allen , ¶ 47 ; Kyllo , 533 U.S. at 33, 121 S.Ct. at 2042-43.
¶22 Here, inspections were conducted of rooms inside Warren's home, her barn, an enclosure in the woods, and a horse trailer-all areas where Warren kept dogs as part of her commercial kennel operation. Courts have found that society would be willing to recognize one's subjective expectation of privacy in commercial property as objectively reasonable, and thus the inspections here constituted searches. Burger , 482 U.S. at 699, 107 S.Ct. at 2642 ("An owner or operator of a business [ ] has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable."
*363 (citing Katz v. United States , 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring))). While the inspection included parts of Warren's home, in which a significant privacy interest is generally recognized, Florida v. Jardines , 569 U.S. 1, 6, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) ("when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.") (internal quotations and citation omitted), Warren included and treated those areas of her home as part of her kennel operation, and thus, in this context, we also consider these areas to be commercial property. This understanding is important because the expectation of privacy in commercial premises "is different than, and indeed less than," the expectation in one's personal home. Burger , 482 U.S. at 700, 107 S.Ct. at 2642 ; accord Donovan v. Dewey , 452 U.S. 594, 598-99, 101 S.Ct. 2534, 2538, 69 L.Ed.2d 262 (1981). Further, the expectation of privacy "is particularly attenuated in commercial property employed in 'closely regulated' industries." Burger , 482 U.S. at 700, 107 S.Ct. at 2642 ; see Donovan , 452 U.S. at 598-99, 101 S.Ct. at 2538 ; see also United States v. Biswell , 406 U.S. 311, 316-17, 92 S.Ct. 1593, 1596-97, 32 L.Ed.2d 87 (1972).
¶23 Warrantless searches, that is, " 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.' " Arizona v. Gant , 556 U.S. 332, 338, 129 S.Ct. 1710, 1716, 173 L.Ed.2d 485 (2009) (quoting Katz , 389 U.S. at 357, 88 S.Ct. at 514 ). Consistent with the acknowledgment that an expectation of privacy is "particularly attenuated" in the property employed in closely regulated industries, ***25 Burger , 482 U.S. at 700, 107 S.Ct. at 2642, one such warrant exception under federal law is for administrative searches of commercial property in closely regulated industries. Burger , 482 U.S. at 703, 107 S.Ct. at 2644 ; City of L.A. v. Patel , --- U.S. ----, 135 S.Ct. 2443, 2452, 192 L.Ed.2d 435 (2015) ; Huber v. N.J. Dep't of Envtl. Prot. , 562 U.S. 1302, 131 S.Ct. 1308, 1308, 179 L.Ed.2d 643 (2011) (cert. denied); see , e.g. , Donovan , 452 U.S. at 598-99, 101 S.Ct. at 2537-38 ; Biswell , 406 U.S. at 316, 92 S.Ct. at 1596 ; Colonnade Catering Corp. v. United States , 397 U.S. 72, 76-77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970). The application of this exception to the warrant requirement is subject to several inquiries, wherein we will consider whether the challenged searches were administrative in nature, whether the industry is closely regulated, and the whether the Supreme Court's three-part test for determining if a warrantless search was reasonable under the Fourth Amendment has been satisfied.
¶24 An administrative search's primary purpose is " 'distinguishable from the general interest in crime control,' " Patel , 135 S.Ct. at 2452 (quoting Indianapolis v. Edmond , 531 U.S. 32, 40, 121 S.Ct. 447, 453, 148 L.Ed.2d 333 (2000) ). Here, the inspections at issue were administrative in nature because they were designed, and their primary purpose was, to enforce Lincoln County Ordinance 7.1.306, which serves an interest other than crime control: to ensure the safety and health of animals and the community at large by enforcing regulations related to dog breeders and dog kennels, such as the requirement for animal vaccinations. The inspections were conducted, first, pursuant to Warren's application for a commercial kennel license, and then, out of a rising concern for the health and wellbeing of the animals kenneled on Warren's property. A criminal search was later initiated by police after securing a warrant, illustrating the distinctive government purposes at work. As the Supreme Court has explained:
Administrative statutes and penal laws may have the same ultimate purpose of remedying [a major] social problem, but they have different subsidiary purposes and prescribe different methods of addressing the problem. An administrative statute establishes how a particular business in a closely regulated industry should be operated, setting forth rules to guide an operator's conduct of the business and allowing government officials to ensure that those rules are followed. Such a regulatory *364 approach contrasts with that of the penal laws, a major emphasis of which is the punishment of individuals for specific acts of behavior.
Burger , 482 U.S. at 712-13, 107 S.Ct. at 2649 (emphasis in original) (internal quotations omitted).
***26 ¶25 A closely regulated industry is one that has " 'such a history of government oversight that no reasonable expectation of privacy, see Katz v. United States , 389 U.S. 347, 351-352, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), could exist for a proprietor over the stock of such an enterprise.' " Burger , 482 U.S. at 700, 107 S.Ct. at 2642 (quoting Barlow's, Inc ., 436 U.S. at 313, 98 S.Ct. at 1821 ). Dog breeding has historically been regulated by the government and, on the federal level, a United States District Court has concluded that dog breeding is a closely regulated industry, noting regulation by Congress. Prof'l Dog Breeders Advisory Council v. Wolff , No. 1:CV-09-0258, 2009 WL 2948527, 2009 U.S. Dist. LEXIS 83054 at *39-41 (M.D. Pa. Sept. 11, 2009) (holding that protecting the health, safety, and welfare of dogs is a legitimate government interest and that "regulation of the dog breeding industry is nothing novel"); 7 U.S.C. §§ 2131 - 2159 (2018) (regulating animals, including dogs, in interstate commerce);[2] 9 C.F.R. § 2.1 (2019) (licensing requirements for animal breeders); see also United States v. Stevens , 559 U.S. 460, 469, 130 S.Ct. 1577, 1585, 176 L.Ed.2d 435 (2010) ("the prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies"). Under state law, Montana has enacted statutes providing for domestic animal control and protection, and authorizing local governmental regulatory schemes to further address animal control. Sections 7-23-101, MCA (requiring dogs over five months old to have a collar with a tag issued by the county or municipality); 7-23-2108 and -2110, MCA (authorizing counties to adopt regulations regarding dogs "running at large," collar and tag requirements, records of dog ownership, and barking dogs); 7-23-4101, MCA (authorizing town councils to adopt regulations for dog licensing and to control "running at large" farm animals and dogs); 7-23-4201, MCA (imposing spaying and neutering requirements). Lincoln County has acted pursuant thereto, adopting animal control ordinances that are more fully discussed herein. The ***27 Supreme Court's comment regarding commercial licensees under the Gun Control Act of 1968, that " '[w]hen a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection,' " is informative about the expectation of an operator of a commercial dog kennel. Burger , 482 U.S. at 701, 107 S.Ct. at 2643 (quoting Biswell , 406 U.S. at 316, 92 S.Ct. at 1596 ). The government's regulatory scheme, including on-site inspections, demonstrates that commercial kenneling is a closely-regulated business such that no reasonable expectation of privacy "could exist for a proprietor over the stock of such an enterprise"-here, the animals in Warren's care. Burger , 482 U.S. at 700, 107 S.Ct. at 2642 (quoting Barlow's, Inc ., 436 U.S. at 313, 98 S.Ct. at 1821 ).
¶26 Then, for a warrantless inspection of commercial premises in a closely regulated industry to be reasonable under the Fourth Amendment, three criteria must be met. Burger , 482 U.S. at 702, 107 S.Ct. at 2644. First, the regulatory scheme authorizing the inspection must be supported by a substantial government interest. Burger , 482 U.S. at 702, 107 S.Ct. at 2644 (citing *365 Donovan , 452 U.S. at 602, 101 S.Ct. at 2540 ; Biswell, 406 U.S. at 315, 92 S.Ct. at 1596 ; Colonnade Catering Corp. , 397 U.S. at 75, 90 S.Ct. at 776 ). As we have noted above, the inspection was administrative in nature that furthered the government's interest in ensuring the health and safety of animals and the community at large. Hooper testified that the inspections made pursuant to the ordinance were "to protect public health, to see that there is adequate care, adequate shelter, adequate food, adequate water" for the animals. We conclude that Lincoln County Ordinance 7.1.306, which authorizes the inspection, is supported by substantial government interests of public and animal health.
¶27 "Second, the warrantless inspections must be 'necessary to further [the] regulatory scheme.' " Burger , 482 U.S. at 702, 107 S.Ct. at 2644 (quoting Donovan , 452 U.S. at 600, 101 S.Ct. at 2538 ). Here, the inspections are necessary to further Lincoln County Ordinance 7.1.306, because physically inspecting the premises of a kennel operation is the only way to ensure that the animals have adequate care and facilities.[3] A warrant is not required to perform the ***28 inspections because the kennel license application requires that a prospective commercial kennel operator consent to inspections of her commercial kennel operation, and such inspections are scheduled with the kennel owner at the owner's convenience. The inspections are not unannounced or frequent. Thus, the inspections under the ordinance are less intrusive than the ordinance upheld by the Supreme Court in Burger , which authorized unannounced, frequent, warrantless inspections of a closely regulated industry. Burger , 482 U.S. at 710-11, 107 S.Ct. at 2648.
¶28 Third, " 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.' " Burger , 482 U.S. at 703, 107 S.Ct. at 2644 (quoting Donovan , 452 U.S. at 603, 101 S.Ct. at 2540 ). This means that "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." Burger , 482 U.S. at 703, 107 S.Ct. at 2644. Under the first warrant function-advising the owner of the premises-the statute must be " 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.' " Burger , 482 U.S. at 703, 107 S.Ct. at 2644 (quoting Donovan , 452 U.S. at 600, 101 S.Ct. at 2538 ). Under the second warrant function-limiting the discretion of the inspectors-the statute must be " 'carefully limited in time, place, and scope.' " Burger , 482 U.S. at 703, 107 S.Ct. at 2644 (quoting Biswell , 406 U.S. at 315, 92 S.Ct. at 1596 ).
¶29 Lincoln County Ordinance 7.1.306 advises that a kennel may be subject to inspection in the following circumstances: (1) an initial inspection when the kennel owner submits a kennel application; (2) a yearly inspection when a kennel license expires; (3) an inspection if Lincoln County Health Department receives a complaint; and (4) an inspection if the holder of a kennel license moves,[4] *366 contra ***29 Burger , 482 U.S. at 710-11, 107 S.Ct. at 2648 (upholding a statute which allowed for inspections on a frequent, unannounced, and regular basis). Thus, a kennel operator knows that an inspection to which she is subject does not arise from a discretionary act by a government official, but only upon identified contingencies. The ordinance also sets forth the scope of the inspection, limiting it to "the intended facilities" (meaning areas intended as kennels), and, accordingly, places the operator on notice as ***30 to how to comply with the statute. In addition, the ordinance identifies for the operator who is authorized to conduct an inspection-any employee of the Lincoln County Health Department, or duly appointed law enforcement officer. Thus, the ordinance provides a constitutionally adequate substitute for a warrant.
¶30 Lincoln County Ordinance 7.1.306, as a whole, serves the regulatory purpose of ensuring the health and safety of the community and preventing animal cruelty. The ordinance furthers a regulatory scheme and defines the time, place, and scope of any inspection. Thus, having fulfilled all three criteria, an administrative inspection under the ordinance of a kennel operation falls within the applicable warrant exception, was reasonable, and did not require a search warrant. Warren's motion to suppress was properly denied.
¶31 2. Did the District Court err by denying Warren's Batson challenge?
¶32 Warren challenges the State's peremptory challenge of Juror Felipe Jara-Pereira, arguing "the prosecutor's discriminatory use of a peremptory strike violated both Warren and Jara-Pereira's rights to equal protection of laws guaranteed under the Fourteenth Amendment." Warren asserts the State's peremptory strike was "racially motivated" and its subsequent race-neutral explanation was a "sham." Warren also argues the District Court's stated reason for denying her Batson challenge-that she was not of the same Hispanic race as Jara-Pereira-was error.
¶33 The use of peremptory challenges to remove prospective jurors on the basis of race is unconstitutional under the Equal Protection Clause of the United States and Montana constitutions. U.S. Const. amend. XIV, § 1 ; Mont. Const. art. II, § 4 ; Batson , 476 U.S. at 89, 106 S.Ct. at 1719 ; Ford , ¶¶ 9-10. This Court has adopted a three-part test to determine whether a Batson violation has occurred. See Ford , ¶ 16 ; State v. Barnaby , 2006 MT 203, ¶¶ 48-49, 333 Mont. 220, 142 P.3d 809.
¶34 First, the party objecting to the peremptory strike must make a prima *367 facie showing of purposeful discrimination. Batson , 476 U.S. at 93, 106 S.Ct. at 1721 ; Ford , ¶ 16. The opponent must show that the proponent of the peremptory strike had-under the facts of this case-a racially-motivated reason for striking the prospective juror, and any other relevant facts and circumstances creating an inference that the proponent used the peremptory jury selection practice to exclude members of the jury panel discriminatorily. Batson , 476 U.S. at 96, 106 S.Ct. at 1723 ; Powers v. Ohio , 499 U.S. 400, 409, 111 S.Ct. 1364, 1369-70, 113 L.Ed.2d 411 (1991) ; Ford , ¶¶ 17, 19. Second, if a prima facie case of ***31 discrimination has been stated, the burden of production shifts to the proponent of the strike to provide a neutral explanation for the strike. Batson , 476 U.S. at 97, 106 S.Ct. at 1723 ; Ford , ¶ 16. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez v. New York , 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) ; see also Purkett v. Elem , 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) ("At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation.") (citing Hernandez , 500 U.S. at 360, 111 S.Ct. at 1860 ). Importantly, the burden of establishing discriminatory intent remains with the opponent, who may respond to the proponent's neutral explanation to demonstrate the proffered reason is pretextual. Batson , 476 U.S. at 98, 106 S.Ct. at 1724. Third, the trial court must determine whether the opponent of the strike has established purposeful discrimination. Batson , 476 U.S. at 98, 106 S.Ct. at 1724 ; Purkett , 514 U.S. at 768, 115 S.Ct. at 1771 ("It is not until the third step that the persuasiveness of the justification becomes relevant-the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.") (internal quotations omitted) (emphasis in original); Ford , ¶ 16.
¶35 Here, Warren made a prima facie showing of racial discrimination by explaining that the State peremptorily struck the only Hispanic juror on the panel. The burden of production then shifted to the State to offer a race-neutral explanation for the strike. The prosecutor did so, explaining that there were several people on the panel who it "didn't get to" during its voir dire questioning, so he struck jurors who had not been questioned, including Jara-Pereira. At this stage, as explained above, the proponent's neutral explanation is taken at face value and, thus, the State satisfied its burden by offering a facially valid, non-discriminatory, basis for striking Jara-Pereira.
¶36 An opportunity then returned to Warren, who still bore the burden of establishing discriminatory intent, to demonstrate that the race-neutral basis for the strike offered by the State was pretextual. Batson , 476 U.S. at 98, 106 S.Ct. at 1724. However, Warren made no effort to do so. Whether the defense felt there was no basis to undermine the State's explanation for the strike, or that there was nothing more to add beyond its prima facie showing, is unknown, but the record reflects no further effort by the defense to carry its burden by establishing pretext.
¶37 At that point the process proceeded to the third step, in which the trial court must determine whether the opponent has carried the burden to establish purposeful discrimination, and the "persuasiveness ***32 of the justification" offered by the proponent is assessed. Purkett , 514 U.S. at 768, 115 S.Ct. at 1771. The District Court ruled, in toto, "I'm going to overrule the objection. I think we have a female Defendant who is not Spanish. I don't think it is-I understand, I understand the objection. I am going to overrule the objection and we are going to proceed with sitting our jury."
¶38 Denying the objection on this basis was error. Although Batson involved a defendant who was part of a cognizable racial group, and a prosecutor's removal of members of the defendant's race from the panel, "the Batson rule no longer applies exclusively to prosecutors striking members of the venire who are the same race as the defendant. Any racially-motivated reason for striking a prospective juror is prohibited under Batson , whether the prospective juror shares the racial identity of the defendant or not." Ford , ¶ 19 (citing *368 Powers , 499 U.S. at 409, 111 S.Ct. at 1370 ).[5] Further, we have admonished trial courts to develop a record for appellate review of a Batson challenge and ruling, "a record that includes all relevant facts and information relied upon by the trial court to render its decision, as well as a full explanation of the court's rationale." State v. Parrish , 2005 MT 112, ¶ 19, 327 Mont. 88, 111 P.3d 671 (citing Ford , ¶ 18 ). The District Court failed to do so here, making appellate review of the issue difficult. We again admonish trial courts to make a proper record in response to Batson challenges.
¶39 As we did in Barnaby , we are here able to conduct a review of the merits of the Batson challenge upon an assessment of the record. Barnaby , ¶¶ 53-55. First, Warren's failure to respond to the State's race-neutral explanation leaves the record devoid of any effort to demonstrate the explanation was pretextual. Then, like the evidence we relied upon in Barnaby , the State's actions regarding other jurors bolsters its race-neutral explanation for its action regarding Jara-Pereira. Barnaby , ¶ 53. The State had eight peremptory challenges. It used its first four peremptory challenges to strike jurors it did not question, followed by using its sixth and seventh peremptory challenges to likewise strike jurors it had not questioned. The State used its fifth and eighth peremptory challenges to strike jurors it had questioned. Thus, out of its eight peremptory challenges, the State used six to strike jurors it had not questioned, including Jara-Pereira. Warren argues on appeal that the State's proffered explanation was ***33 pretextual because three other jurors who were not questioned by the State were empaneled on the jury. However, two of those jurors were questioned by the defense, allowing the State to hear from them during voir dire. Thus, only one juror was empaneled who was not questioned by either the State or the defense. In light of the many jurors struck by the State who had not been questioned, and the fact that the State used all eight of its peremptory challenges, leaving only one juror on the jury who had not been questioned, we cannot conclude Warren carried her burden to demonstrate the State's explanation was pretextual and that it struck Jara-Pereira on racial grounds. We therefore conclude that the District Court reached the right result on the Batson challenge, but for the wrong reason. Parrish , ¶ 20.
¶40 3. Did the District Court err in calculating the statutory costs owed by Warren under § 45-8-211(3), MCA ?
¶41 Warren challenges the amount of costs imposed by the District Court, but argues pursuant to Montana's general restitution statutes, §§ 46-18-241, -243, MCA. However, the Cruelty to Animals statute, § 45-8-211(3), MCA, under which Warren was charged, specifically addresses the costs to be imposed upon conviction of this offense. Thus, Warren is liable for these statutorily-imposed costs, rather than restitution imposed under the general sentencing provisions.
¶42 Generally, Warren argues she is not required to pay the $ 35,141.00 imposed for the costs of sheltering with TVAS, because this was a contracted cost that Lincoln County was obligated to pay in any event. Warren also argues that the $ 6,918.27 for lost revenue imposed as a cost is speculative and unsupported by the evidence.
¶43 As provided by the Cruelty to Animals statute, a person convicted of cruelty to animals must pay the reasonable costs of necessary veterinary care and treatment, and may also be required to pay other reasonable costs incurred in caring for the animals, including costs incurred by a "public or private" animal control agency or animal shelter. Section 45-8-211(3), MCA ; see also State v. Beaudet , 2014 MT 152, ¶ 20, 375 Mont. 295, 326 P.3d 1101.
¶44 The costs claimed by the Lincoln County Health Department, who was responsible for the care and shelter of Warren's dogs after they were seized, included veterinary care, food and supplies, contracted sheltering, county employee overtime hours, travel, and lost revenue, for a total of $ 72,109.00, *369 which the District Court reduced to $ 67,432.42, and imposed upon Warren. At sentencing, the State presented Hooper's signed affidavit testifying to the county's pecuniary loss. The loss did not include any of the volunteer time or the various ***34 donations that included veterinary services, medical supplies, and food.
¶45 The contracted sheltering cost was a nuanced question. Hooper testified the total cost included sheltering in both Libby, at the Lincoln County Animal Control, and Eureka, at TVAS, because "[i]t took two different shelters to house all the animals." While the Lincoln County Health Department has a contract with TVAS to shelter county animals, for which the County paid monthly, TVAS provided services in addition to those contemplated by the contract to care for Warren's animals during the subject ten-month period. As Hooper explained, "I included the monthly contract costs for those two shelters, plus additional cost of care, for hours over the contract that were needed at those shelters." (emphasis added). Lincoln County paid the costs of these additional services, but as explained by Hooper, both shelters were filled to capacity with Warren's animals and were unable to shelter any other animals during the subject period, resulting in revenue loss at both facilities.[6] The lost revenue amount was included because the County was "unable to conduct normal animal control business" such as taking in and adopting out animals, and the shelters and employees' activities were otherwise consumed with caring for Warren's animals, causing them to lose revenue. Hooper testified that the lost revenue amount was calculated by a comparison between "last year's revenue with this year's revenue for the same period" resulting in a difference of $ 6,918.27. Moreover, neither Lincoln County nor TVAS earned any profit from caring for Warren's animals.
¶46 We conclude that the costs approved by the District Court were reasonably supported by the evidence. The shelters were literally overrun by Warren's numerous animals. We concur with the District Court that the costs imposed were tied to Warren's conduct in this case. Moreover, to the extent the lost revenue was arguably speculative, the District Court took Warren's objections into consideration and reduced the total amount claimed. Thus, we affirm the amount of statutory costs imposed by the District Court.
¶47 Affirmed.
We concur:
MIKE McGRATH, C.J.
BETH BAKER, J.
LAURIE McKINNON, J.
DIRK M. SANDEFUR, J.

Indeed, in Warren's Opening Brief, Warren's counsel states:
Undersigned counsel avoids raising Montana's otiose privacy analysis in this appeal. Historically, the Court, like the district court, always paid lip service to Montana's Constitution, Article II, Sections 10 and 11, as conferring greater privacy protection than does federal law from warrantless searches, and [sic] while in the same breath it undercut the bedrock privacy protections of the Fourth Amendment. See State v. Boyer , 2002 MT 33, ¶¶ 57-78, 308 Mont. 276, 42 P.3d 771 (The dissent attempting and failing to convince this Court that a boat owner has a reasonable expectation of privacy in his boat and that a physical intrusion into transoms and parts of a boat to look for evidence constitutes a 'classic search in the constitutional sense.').

7 U.S.C. §§ 2131 -2159 (2018) is the Animal Welfare Act (AWA) of 1966. See also United States Department of Agriculture, Regulated Businesses (Licensing and Registration) , https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/SA_Regulated_Businesses (last updated Aug. 10, 2018); United States Department of Agriculture, Animal Welfare Act , https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/sa_awa/ct_awa_program_information (last updated Jan. 30, 2019). The United States Department of Agriculture (USDA) requires breeders who sell more than 25 dogs per year or who have more than four breeding female dogs to be licensed as a dealer. USDA inspectors conduct routine, unannounced inspections of all facilities licensed or registered under the AWA to assess their compliance with AWA. The AWA is the only federal law in the United States that regulates the treatment of animals in research and exhibition, and includes, relevantly, the treatment of live dogs.

For example, it was only upon physical inspection of the kennel premises that Hooper discovered many of Warren's dogs were not vaccinated; when Warren gave Hooper vaccination records, they did not match all the dogs at Warren's kennel. Some vaccination records were not accounted for and some records were for dogs that were no longer present at the kennel.

The Ordinance provides as follows:
7.1.306 KENNEL LICENSING: A kennel license is required for any person, family or household meeting the definition of "kennel". Application for a kennel license must be made to the Lincoln County Animal Control Officer. The intended facilities are subject to inspection by an Animal Control Officer, Lincoln County Health Officer or designee. The permit shall be issued upon the following conditions:
1. There must be adequate shelter and secure enclosure(s) for the animals on the premises.
2. Proof of current rabies vaccination must be provided for each dog over six (6) months of age.
3. Veterinary care provided when needed to prevent suffering or disease transmission.
4. The owner uses suitable means of disposing of animal feces so that it does not become a nuisance or a health hazard.
5. In the investigating officer's opinion, the animals receive proper care, food, water, shelter and humane treatment.
6. The kennel license shall list the maximum number of animals over the age of six (6) months allowed on the premises and if the holder of the permit exceeds that number, it shall be grounds for revocation of all permits for that location;
7. Lincoln County Animal Control shall approve or deny the application based on the information submitted by the applicant and on the recommendation of the investigating officer. Lincoln County Animal Control may issue a conditional permit, but must state the permit conditions on the document and ensure that the applicant is advised of the conditions;
8. The applicant must pay the kennel license fee to Lincoln County Animal Control before the permit is issued;
9. All premises for which a kennel license is issued may be subject to annual inspections by the Animal Control Officer. The inspections may also be instigated if a complaint is received. The Animal Control Officer, on determining that such premises are not being maintained and/or conditions of the permit are not met, may revoke the kennel license.
10. Within ten (10) days of the birth of a litter which is to be for sale, the owner must apply for a kennel license.
11. If the holder of a kennel license moves, he or she must provide written notice of their new address within thirty (30) days of moving. Lincoln County Animal Control will then conduct an inspection and take appropriate action under this section based on any changes at the permit holder's new residence.
12. The kennel license if valid for one (1) year from the issue date;
13. Kennel licenses must be renewed within thirty (30) days of the expiration date or the application will be treated as a new application.
Health and Environment Regulations, 7.1.306 Kennel Licensing , (Sept. 13, 2017), http://www.lincolncountymt.us/images/departments/health_department/Animal_Control/Animal_Control_Ordinance_Final__2017.pdf.

The Batson rule has been applied in other contexts as well, beyond the facts of this case. See Ford , ¶ 19.

The County was responsible for sixty-seven dogs and six donkeys, with twenty to twenty-seven dogs sheltered in Libby and the rest in Eureka.